John Robertelli, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Sean Gorton, Esq.
RIVKIN RADLER LLP
21 Main Street, Suite 158
Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287-2460
john.robertelli@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,

Plaintiffs,

-against-

ANTONIO CICCONE, D.O.,
JOHN SMITH, M.D.
ALVIN MICABALO, D.O.,
ANDREI LOGVINENKO, M.D.,
JASON BAYNES, M.D.,
JERRY MENDEZ, D.C., and
NJ PAIN REHABILITATION GROUP, P.C.,

Defendants.

Docket No.: _______( )

**Plaintiffs Demand a Trial by Jury**

**<u>COMPLAINT</u>**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to recover more than $240,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including purported patient examinations, diagnostic testing, chiropractic services, physical therapy, and interventional pain management services (collectively, the "Fraudulent Services").

2. The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3. The Defendants fall into the following categories:

(i) Defendant NJ Pain Rehabilitation Group, P.C. ("NJ Pain") is a New Jersey medical professional corporation, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO;

(ii) Defendant John Smith, M.D. ("Smith") is a physician licensed to practice in New Jersey, and owned and controlled NJ Pain;

(iii) Defendant Antonio Ciccone, D.O. ("Ciccone") is a physician licensed to practice in New Jersey, owned and controlled NJ Pain, and purported to perform many of the Fraudulent Services;

(iv) Defendant Alvin Micabalo, D.O. ("Micabalo") is a physician licensed to practice in New Jersey, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services;

(v) Defendant Andrei Logvinenko, M.D. ("Logvinenko") is a physician licensed to practice in New Jersey, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services;

(vi) Defendant Jason Baynes, M.D. ("Baynes") is a physician licensed to practice in New Jersey, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services; and

(vii) Defendant Jerry Mendez, D.C. ("Mendez") is a chiropractor licensed to practice chiropractic in New Jersey, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services.

4. As discussed below, the Defendants at all relevant times have known that:

(i) the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instance;

(ii) the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, therefore, were not eligible for no-fault insurance reimbursement in the first instance;

(iii) the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv) in many cases, the Fraudulent Services never were provided in the first instance; and

(v) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5. As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO by the Defendants.

6. The chart annexed hereto as Exhibit "1" sets forth a large, representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

7. The Defendants' fraudulent scheme began no later than 2012 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $240,000.00.

## THE PARTIES

### I. Plaintiffs

8. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal place of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II. Defendants

9. Defendant NJ Pain is a New Jersey medical professional corporation with its principal place of business in New Jersey. NJ Pain was incorporated in New Jersey on or about March 26, 2008, was owned and controlled by Ciccone and Smith, and was used by Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez as a vehicle to submit fraudulent billing to GEICO and other insurers.

10. Defendant Smith resides in and is a citizen of New Jersey. Smith was licensed to practice medicine in New Jersey on or about November 5, 1997, and owned and controlled NJ Pain.

11. Defendant Ciccone resides in and is a citizen of New Jersey. Ciccone was licensed to practice medicine in New Jersey on or about February 14, 1992, owned and controlled NJ Pain, and purported to perform many of the Fraudulent Services.

12. Defendant Micabalo resides in and is a citizen of New Jersey. Micabalo was licensed to practice medicine in New Jersey on or about May 2, 2007, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services.

13. Defendant Logvinenko resides in and is a citizen of New Jersey. Logvinenko was licensed to practice medicine in New Jersey on or about May 24, 1996, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services.

14. Defendant Baynes resides in and is a citizen of New Jersey. Baynes was licensed to practice medicine in New Jersey on or about June 1, 2009, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services.

15. Defendant Mendez resides in and is a citizen of New Jersey. Mendez was licensed to practice chiropractic in New Jersey on or about April 4, 2006, was employed by or associated with NJ Pain, and purported to perform many of the Fraudulent Services.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

17. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

18. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I. An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A. The New Jersey No-Fault Laws

20. New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

21. Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

### B. No-Fault Reimbursement and Compliance with New Jersey Law Governing Healthcare Practice

22. In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

23. Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (App. Div. 2009)("This court has held that a provider of such

services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515-519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

24. Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

25. By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

26. Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

## C. No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths

27. Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

28. Pursuant to N.J.S.A. 39:6A-2(m):

> "Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury
>
> (i) is not primarily for the convenience of the injured person or provider;
>
> (ii) is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and
>
> (iii) does not involve unnecessary diagnostic testing.

29. Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back and soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3-4.6.

30. Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i) cervical spine strains, sprains, and bruises;

(ii) cervical herniated discs and radiculopathies;

(iii) thoracic spine strains, sprains, and bruises;

(iv) thoracic herniated discs or radiculopathies;

(v) lumbar-sacral spine strains, sprains, and bruises;

(vi) lumbar-sacral herniated discs or radiculopathies.

31. The Care Paths generally provide for an initial, four-week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

32. Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths generally require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

33. The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**D. The Fee Schedule and Current Procedural Terminology Codes**

34. New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

35. When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

36. The No-Fault Laws specifically prohibit healthcare service providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29:6.

37. The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

38. Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

39. The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3-29.4.

40. With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

> Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

41. Chapter 1 of the NCCI Policy manual provides that:

> Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

42. Chapter 12 of the MCPM provides that:

> The narrative for many CPT codes includes a parenthetical statement that the procedure represents a 'separate procedure.' The inclusion of this statement indicates that the procedure, while possible to perform separately, is generally included in a more comprehensive procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

**E. The New Jersey Insurance Fraud Prevention Act**

43. New Jersey has a strong public policy against insurance fraud. The policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act, N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or
>
> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or
>
> Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right of entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

44. A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of the provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

45. Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A. 17:33A-7(a).

46. A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

47. The IFPA defines a pattern as five or more "related violations". Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A. 17:33A-3.

## II. The Defendants' Fraudulent Scheme

48. Beginning no later than 2012, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO more than $240,000.00 for medically unnecessary, illusory, and otherwise unreimbursable services.

### A. The Defendants' Fraudulent Treatment and Billing Protocol

49. Virtually all of the Insureds in the claims identified in Exhibit "1" whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

50. In keeping with the fact that virtually all of the Insureds in the claims identified in Exhibit "1" were involved in only minor accidents, to the extent that the Insureds reported to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

51. Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

52. Concomitantly, virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

53. Even so, the Defendants subjected virtually every Insured in the claims identified in Exhibit "1" to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

54. The Defendants provided their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

55. Each step in the Defendants' fraudulent treatment and billing protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault insurance billing for each Insured.

56. No legitimate physician, chiropractor, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

57. The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

**B. The Fraudulent Initial Examinations and Consultations at NJ Pain**

58. As an initial step in the Defendants' fraudulent scheme, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to provide virtually every Insured in the claims identified in Exhibit "1" with multiple initial examinations and/or consultations.

59. Either Ciccone, Micabalo, Logvinenko, Baynes, or Mendez purported to perform

virtually all of the putative initial examinations and/or consultations in the claims identified in Exhibit "1".

60. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez then billed the putative initial examinations and/or consultations to GEICO under: (i) CPT code 99203, almost always resulting in charges of $300.00 per examination; (ii) CPT code 99204, almost always resulting in charges of $375.00 per examination; (iii) or CPT code 99245, almost always resulting in charges of $475.00 per consultation.

61. In the claims for initial examinations and consultations identified in Exhibit "1", the charges for the initial examinations and consultations were fraudulent in that they misrepresented NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's eligibility to collect PIP Benefits in the first instance.

62. In fact, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither they nor the examinations and consultations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

63. Furthermore, in the claims for initial examinations and consultations under CPT codes 99203, 99204, and 99245 that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely misrepresented the severity of the Insureds' presenting problems.

64. Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial

patient examination typically requires that the Insured present with problems of moderate severity.

65. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

66. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii) Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii) Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv) Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v) Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

67. Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

68. Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99204 and 99245 to bill for an initial patient examination or consultation typically requires that the Insured present with

problems of moderate to high severity.

69. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 or 99245 to bill for an initial patient examination or consultation.

70. For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi) Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

71. Similarly, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99245 to bill for an initial patient examination:

(i) Consultation in the emergency, room for a 25-year-old male with severe, acute, closed head injury (Neurosurgery)

(ii) Office consultation for a 23-year-old female with Stage II A Hodgkins disease with positive supraclavicular and mediastinal nodes. (Radiation Oncology)

72. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 or 99245 to bill for an initial patient examination or consultation typically are problems that pose a serious threat to the patient's health, or even the patient's life.

73. By contrast, to the limited extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

74. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "1" contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

75. What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

76. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or other soft tissue injury diagnosis.

77. Even so, in the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely billed for their putative initial examinations and consultations using CPT codes 99203, 99204, or

99245, and thereby falsely represented that the Insureds presented during the initial examinations with problems of moderate or moderate to high severity.

78. For example:

(i) On October 11, 2012, an Insured named TZ was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident, TZ's car was drivable following the accident, and TZ drove her car from the scene of the accident. Furthermore, TZ did not visit any hospital emergency room following the accident. To the extent that TZ experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of TZ by Micabalo on October 19, 2012, Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that TZ presented with problems of moderate severity.

(ii) On November 10, 2012, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicates that no one was injured in the accident and JW refused medical treatment at the scene of the accident. Even so, later that day, JW presented to Meadowlands Hospital where he complained of a headache but denied experiencing any neck or back pain. JW was examined and discharged on the same day with a head bruise diagnosis. To the extent that JW experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of JW by Micabalo on November 27, 2012, Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JW presented with problems of moderate severity.

(iii) On November 10, 2012, an Insured named JW was involved in an automobile accident. The contemporaneous police reports indicate that no one was injured in the accident and JW refused medical treatment at the scene of the accident. Even so, later that day, JW presented to Meadowlands Hospital where he complained of a headache but denied experiencing any neck or back pain. JW was examined and discharged on the same day with a head bruise diagnosis. To the extent that JW experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of JW by Mendez on November 30, 2012, Ciccone, Smith, Mendez and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JW presented with problems of moderate to high severity.

(iv) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident, and the car JS was traveling in was drivable following the accident. Furthermore,

JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of JS by Logvinenko on January 19, 2013, Ciccone, Smith, Logvinenko, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JS presented with problems of moderate severity.

(v) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of JS by Mendez on January 21, 2013, Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JS presented with problems of moderate to high severity.

(vi) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial consultation of JS by Baynes on March 16, 2013, Ciccone, Smith, Baynes, and NJ Pain billed GEICO for the initial consultation using CPT code 99245, and thereby falsely represented that JS presented with problems of moderate to high severity.

(vii) On July 16, 2013, an Insured named OM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags did not deploy, OM's car was drivable following the accident, OM drove his car from the scene of the accident, and OM refused medical treatment at the scene of the accident. Even so, OM presented later that day at Palisades Medical Center where he was briefly observed, and then discharged with a minor sprain/strain diagnosis. The hospital medical records indicate that OM's symptoms were mild and improving at the time he was discharged. To the extent OM experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of OM by Mendez on August 7, 2013, Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that OM presented with problems of moderate to high severity.

(viii) On May 11, 2013, an Insured named CV was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and the cars were drivable following the accident. Furthermore, CV did not visit any hospital emergency room following the accident. To the extent that CV experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of CV by Micabalo on December 23, 2013, Ciccone, Smith, Micabalo and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CV presented with problems of moderate severity.

(ix) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of FU by Mendez on January 17, 2014, Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that FU presented with problems of moderate to high severity.

(x) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of FU by Ciccone on January 22, 2014, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that FU presented with problems of moderate to high severity.

(xi) On June 18, 2014, an Insured named EG was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that the airbags did not deploy, the cars were drivable following the accident, and EG drove her car from the scene of the accident. Furthermore, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of EG by Micabalo on September 18, 2014,

Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that EG presented with problems of moderate severity.

(xii) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. To the extent that HG experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of HG by Ciccone on October 1, 2014, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that HG presented with problems of moderate to high severity.

(xiii) On September 27, 2014, an Insured named MC was involved in an automobile accident. MC was transported to Trinitas Regional Medical Center where she was briefly observed and discharged with a diagnosis of shoulder pain. The contemporaneous police reports indicate that the airbags in MC's vehicle did not deploy at the time of the accident and the hospital medical records indicate that MC's pain was improving at the time she was discharged. To the extent that MC was experiencing any health problems as a result of her accident, they were of low severity. Even so, following a purported initial examination of MC by Ciccone on October 1, 2014, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MC presented with problems of moderate to high severity.

(xiv) On September 27, 2014, an Insured named AF was involved in an automobile accident. AF was transported to Trinitas Regional Medical Center where she was briefly observed and discharged with a diagnosis of neck pain. The contemporaneous police reports indicate that the airbags in AF's vehicle did not deploy at the time of the accident and the hospital medical records indicate that AF's pain was improving at the time she was discharged. To the extent that AF was experiencing any health problems as a result of her accident, they were of low severity. Even so, following a purported initial examination of AF by Ciccone on October 1, 2014, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AF presented with problems of moderate to high severity.

(xv) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. To the extent that HG experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of HG by Mendez on October

3, 2014, Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that HG presented with problems of moderate to high severity.

(xvi) On September 27, 2014, an Insured named MC was involved in an automobile accident. MC was transported to Trinitas Regional Medical Center where she was briefly observed and discharged with a diagnosis of shoulder pain. The contemporaneous police reports indicate that the airbags in MC's vehicle did not deploy at the time of the accident and the hospital medical records indicate that MC's pain was improving at the time she was discharged. To the extent that MC experienced any health problems as a result of her accident, they were of low severity. Even so, following a purported initial examination of MC by Mendez on October 3, 2014, Ciccone, Smith, Mendez and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MC presented with problems of moderate to high severity.

(xvii) On September 27, 2014, an Insured named AF was involved in an automobile accident. AF was transported to Trinitas Regional Medical Center where she was briefly observed and discharged with a diagnosis of neck pain. The contemporaneous police reports indicate that the airbags in AF's vehicle did not deploy at the time of the accident and the hospital medical records indicate that AF's pain was improving at the time she was discharged. To the extent that AF was experiencing any health problems as a result of her accident, they were of low severity. Even so, following a purported initial examination of AF by Mendez on October 3, 2014, Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AF presented with problems of moderate to high severity.

(xviii) On July 27, 2014, an Insured named ET was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured during the accident, the car was drivable following the accident, ET drove his car from the scene of the accident, and ET refused medical treatment at the scene of the accident. Even so, ET presented the next day to Bayonne Medical Center, where he was examined, and discharged on the same day with a minor sprain diagnosis. To the extent ET experienced any health problems as a result of his accident, they were of low severity. Even so, following a purported initial examination of ET by Micabalo on December 12, 2014, Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that ET presented with problems of moderate severity.

(xix) On December 4, 2014, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicates that GB was not injured during the accident. Furthermore, GB did not visit any hospital emergency room following the accident. To the extent that GB experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a

purported initial examination of GB by Micabalo on December 16, 2014, Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GB presented with problems of moderate severity.

(xx) On December 4, 2014, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicates that GB was not injured during the accident. Furthermore, GB did not visit any hospital emergency room following the accident. To the extent that GB experienced any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial consultation of GB by Baynes on April 14, 2015 Ciccone, Smith, Baynes, and NJ Pain billed GEICO for the initial consultation using CPT code 99245, and thereby falsely represented that GB presented with problems of moderate to high severity.

79. These are only representative examples. In virtually all of the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they actually had any presenting problems at all.

80. In the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, and 99245, because examinations billable under CPT codes 99203, 99204, and 99245 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

81. In the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity

in order to create a false basis for the laundry list of other Fraudulent Services that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to provide to the Insureds, including follow-up examinations, diagnostic testing, chiropractic services, and interventional pain management services.

### 2. Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations

82. Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

83. Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

84. Pursuant to the Fee Schedule, the use of CPT code 99245 to bill for a patient consultation represents that the physician or chiropractor who conducted the consultation spent at least 80 minutes of face-to-face time with the patient or the patient's family.

85. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez submitted virtually all of their billing for initial examinations and consultations under CPT codes 99203, 99204, or 99245, and thereby represented that the physicians or chiropractors who purported to perform the initial examinations and consultations spent either 30 minutes, 45 minutes, or 80 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations and consultations.

86. In fact, in the claims for initial examinations and consultations identified in Exhibit "1", neither Ciccone, Micabalo, Logvinenko, Baynes, Mendez, nor any other physician or chiropractor associated with NJ Pain ever spent 30 minutes – let alone 45 minutes or 80

minutes – of face-to-face time with the Insureds or their families when conducting the examinations and consultations.

87. Rather, in the claims for initial examinations identified in Exhibit "1", the initial examinations and consultations did not entail more than 15 minutes of face-to-face time between the examining physicians or chiropractors and the Insureds or their families, to the extent that the examinations and consultations actually were performed in the first instance.

88. For instance, and in keeping with the fact that the initial examinations allegedly provided through NJ Pain did not entail more than 15 minutes of face-to-face time with the Insureds or their families, NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez used template forms in purporting to conduct the initial examinations.

89. The template forms that NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

90. The only face-to-face time between the examining physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

91. These brief interviews and limited examinations did not require Ciccone, Micabalo, Logvinenko, Baynes, Mendez, or any other provider associated with NJ Pain to spend more than 15 minutes of face-to-face time with the Insureds or their families.

92. In the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez falsely represented that the examinations and consultations involved either 30 minutes, 45 minutes, or 80 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their

charges under CPT codes 99203, 99204, and 99245 because examinations and consultations billable under CPT codes 99203, 99204, and 99245 are reimbursable at a higher rate than examinations and consultations that require less time to perform.

### 3. Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations

93. Furthermore, pursuant to the CPT Assistant, when NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez submitted billing for their initial examinations and consultations using CPT codes 99204 and 99245, they represented that they provided "comprehensive" physical examinations to the Insureds who purportedly received the examinations and consultations.

94. Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

95. Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

96. The CPT Assistant recognizes the following organ systems:

(i) constitutional symptoms (e.g., fever, weight loss);

(ii) eyes;

(iii) ears, nose, mouth, throat;

(iv) cardiovascular;

(v) respiratory;

(vi) gastrointestinal;

(vii) genitourinary;

(viii) musculoskeletal;

(ix) integumentary (skin and/or breast);

(x) neurological;

(xi) psychiatric;

(xii) endocrine;

(xiii) hematologic/lymphatic; and

(xiv) allergic/immunologic.

97. To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

98. Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i) at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii) the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii) examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v) examination of gait and station;

(vi) examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper

extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii) inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and

(ix) mental status, including orientation to time, place and person, as well as mood and affect.

99. Similarly, pursuant to the CPT Assistant, when NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez submitted billing for their initial examinations using CPT code 99203, they represented that they provided "detailed" physical examinations to the Insureds who purportedly received the examinations.

100. Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

101. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i) measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii) general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii) examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin and/or other location;

(v) brief assessment of mental status;

(vi) examination of gait and station;

(vii) inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii) coordination;

(ix) examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x) examination of sensation.

102. In the claims for initial examinations and consultations that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely represented that they had provided either "comprehensive" physical examinations (when billed under CPT codes 99204 or 99245) or "detailed" physical examinations (when billed under CPT code 99203) to the Insureds, when in fact the putative examinations did not meet the requirements of CPT codes 99204, 99245, or 99203.

103. For example:

(i) On January 19, 2013, NJ Pain, Ciccone, Smith, and Logvinenko billed GEICO under CPT code 99203 for an initial examination that Logvinenko purported to provide to an Insured named JS, and thereby represented that Logvinenko had performed a "detailed" physical examination on JS. However, Logvinenko did not document an extended examination of JS's musculoskeletal system, despite the fact that – to the extent JS had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(ii) On July 11, 2013, NJ Pain, Ciccone, Smith, and Logvinenko billed GEICO under CPT code 99203 for an initial examination that Logvinenko purported to provide to an Insured named MV, and thereby represented that Logvinenko had performed a "detailed" physical examination on MV. However, Logvinenko did not document an extended examination of MV's musculoskeletal system, despite the fact that – to the extent MV had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(iii) On January 24, 2014, NJ Pain, Ciccone, Smith, and Mendez billed GEICO under CPT code 99204 for an initial examination that Mendez purported to provide to an Insured named DR, and thereby represented that Mendez had performed a "comprehensive" physical examination on DR. However, Mendez did not document findings with respect to at least eight of DR's organ systems, nor did he document a "complete" examination of DR's musculoskeletal system or any of DR's other organ systems.

(iv) On March 12, 2014, NJ Pain, Ciccone, and Smith billed GEICO under CPT code 99204 for an initial examination that Ciccone purported to provide to an Insured named CM, and thereby represented that Ciccone had performed a "comprehensive" physical examination on CM. However, Ciccone did not document findings with respect to at least eight of CM's organ systems, nor did he document a "complete" examination of CM's musculoskeletal system or any of CM's other organ systems.

(v) On June 25, 2014, NJ Pain, Ciccone, Smith, and Baynes billed GEICO under CPT code 99245 for an initial consultation that Baynes purported to provide to an Insured named FM, and thereby represented that Baynes had performed a "comprehensive" physical examination on FM. However, Baynes did not document findings with respect to at least eight of FM's organ systems, nor did he document a "complete" examination of FM's musculoskeletal system or any of FM's other organ systems.

(vi) On November 18, 2014, NJ Pain, Ciccone, and Smith billed GEICO under CPT code 99204 for an initial examination that Ciccone purported to provide to an Insured named IR, and thereby represented that Ciccone had performed a "comprehensive" physical examination on IR. However, Ciccone did not document findings with respect to at least eight of IR's organ systems, nor did he document a "complete" examination of IR's musculoskeletal system or any of IR's other organ systems.

(vii) On August 20, 2014, NJ Pain, Ciccone, Smith, and Mendez billed GEICO under CPT code 99204 for an initial examination that Mendez purported to provide to an Insured named SC, and thereby represented that Mendez had performed a "comprehensive" physical examination on SC. However, Mendez did not document findings with respect to at least eight of SC's organ systems, nor did he document a "complete" examination of SC's musculoskeletal system or any of SC's other organ systems.

(viii) On March 19, 2015, NJ Pain, Ciccone, Smith, and Micabalo billed GEICO under CPT code 99203 for an initial examination that Micabalo purported to provide to an Insured named NR, and thereby represented that Micabalo had performed a "detailed" physical examination on NR. However, Micabalo did not document an extended examination of NR's musculoskeletal system, despite the fact that – to the extent NR had any complaints at all as the result of the underlying automobile

accident – they were limited to minor musculoskeletal complaints.

(ix) On April 9, 2015, NJ Pain, Ciccone, Smith, and Micabalo billed GEICO under CPT code 99203 for an initial examination that Micabalo purported to provide to an Insured named DQ, and thereby represented that Micabalo had performed a "detailed" physical examination on DQ. However, Micabalo did not document an extended examination of DQ's musculoskeletal system, despite the fact that – to the extent DQ had any complaints at all as the result of the underlying automobile accident – they were limited to minor musculoskeletal complaints.

(x) On April 14, 2015, NJ Pain, Ciccone, Smith, and Baynes billed GEICO under CPT code 99245 for an initial consultation that Baynes purported to provide to an Insured named GB, and thereby represented that Baynes had performed a "comprehensive" physical examination on GB. However, Baynes did not document findings with respect to at least eight of GB's organ systems, nor did he document a "complete" examination of GB's musculoskeletal system or any of GB's other organ systems.

104. These are only representative examples. In virtually all of the claims for initial examinations and consultations under CPT codes 99203, 99204, and 99245 that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez falsely represented that they had provided "comprehensive" or "detailed" physical examinations, when in fact they had not.

105. In the claims for initial examinations and consultations under CPT codes 99203, 99204, and 99245 that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez falsely represented that they had provided comprehensive or detailed physical examinations to the Insureds in order to create a false basis for their charges for the examinations and consultations under CPT codes 99203, 99204, and 99245, because examinations and consultations billable under CPT codes 99203, 99204, and 99245 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide comprehensive or detailed physical examinations.

**4. Misrepresentations Regarding the Extent of Medical Decision-Making**

106. Furthermore, when NJ Pain, Ciccone, Smith, and Baynes submitted charges for initial consultations under CPT code 99245, they represented that the consultations entailed "high complexity" medical decision-making.

107. In addition, when NJ Pain, Ciccone, Smith, Mendez, and Micabalo submitted charges for initial examinations under CPT code 99204, they represented that the examinations entailed medical decision-making of "moderate complexity".

108. When NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, and Mendez submitted charges for initial examinations under CPT code 99203, they represented that the examinations entailed medical decision-making of "low complexity".

109. Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

110. Though NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely represented that their initial examinations and consultations involved medical decision-making of "high complexity" (when billed under CPT code 99245), "moderate complexity" (when billed under CPT code 99204), or "low complexity" (when billed under CPT code 99203), in actuality the initial examinations and consultations did not involve any medical decision-making at all.

111. First, in virtually every case, the initial examinations and consultations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information. When the Insureds presented to NJ Pain for treatment, they did not arrive with any medical records except, at times, basic radiology reports. Furthermore, prior to the initial examinations and consultations, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

112. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

113. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the procedures and treatment provided by NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez, to the extent that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided any such procedures and treatment in the first instance.

114. In almost every instance, the "treatments" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez actually provided were limited to follow-up examinations, chiropractic services, physical therapy, electrodiagnostic testing, percutaneous neuromodulation therapy ("PNT") treatments, and trigger point injections, none of which was health- or life-threatening if properly administered.

115. Third, in virtually every case, NJ Pain, Smith, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations and consultations.

116. Rather, to the extent that the initial examinations and consultations were conducted in the first instance, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided substantially similar, pre-determined pain, sprain/strain, and related "diagnosis" for every Insured.

117. Then, based upon these supposed "diagnoses", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez directed virtually every Insured to return to NJ Pain on an ongoing basis for medically unnecessary follow-up examinations, chiropractic services, physical therapy, electrodiagnostic testing, PNT treatments, and trigger point injections.

118. For example:

(i) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident, and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. On January 19, 2013 Logvinenko purported to conduct an initial examination of JS at NJ Pain. Logvinenko did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Logvinenko did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Logvinenko provided JS with substantially the same, phony, boilerplate "diagnoses" that Logvinenko provided to virtually every other Insured. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Logvinenko and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Logvinenko and NJ Pain consisted of medically unnecessary physical therapy and chiropractic treatments, none of which was health- or life- threatening if properly administered to JS. Even so, Logvinenko, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Logvinenko engaged in some legitimate "low complexity" medical decision-making during the purported examination.

(ii) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident, and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. On January 21, 2013 Mendez purported to conduct an initial examination of JS at NJ Pain.

Mendez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Mendez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mendez provided JS with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Mendez provided to virtually every other Insured. Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Mendez and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Mendez and NJ Pain consisted of medically unnecessary chiropractic manipulations, none of which was health- or life- threatening if properly administered to JS. Even so, Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Mendez engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(iii) On July 16, 2013, an Insured named OM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags did not deploy, OM's car was drivable following the accident, OM drove his car from the accident site, and OM refused medical treatment at the scene of the accident. Even so, OM presented later that day at Palisades Medical Center where he was briefly observed, and then discharged with a minor sprain/strain diagnosis. The hospital medical records indicate that OM's symptoms were mild and improving at the time he was discharged. On August 7, 2013, Mendez purported to conduct an initial examination of OM at NJ Pain. Mendez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Mendez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mendez provided OM with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Mendez provided to virtually every other Insured. Furthermore, neither OM's presenting problems, nor the treatment plan provided to OM by Mendez and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Mendez and NJ Pain consisted of medically unnecessary chiropractic manipulations and computerized range of motion and muscle strength tests, none of which was health- or life- threatening if properly administered to OM. Even so, Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Mendez engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(iv) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident,

and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. On January 17, 2014, Ciccone purported to conduct an initial examination of FU at NJ Pain. Ciccone did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Ciccone did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ciccone provided FU with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Ciccone provided to virtually every other Insured. Furthermore, neither FU's presenting problems, nor the treatment plan provided to FU by Ciccone and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Ciccone and NJ Pain consisted of medically unnecessary trigger point injections and computerized range of motion and muscle strength tests, none of which was health- or life- threatening if properly administered to FU. Even so, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ciccone engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(v) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. On January 22, 2014 Mendez purported to conduct an initial examination of FU at NJ Pain. Mendez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Mendez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mendez provided FU with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Mendez provided to virtually every other Insured. Furthermore, neither FU's presenting problems, nor the treatment plan provided to FU by Mendez and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Mendez and NJ Pain consisted of medically unnecessary chiropractic manipulations and computerized range of motion and muscle strength tests, none of which was health- or life- threatening if properly administered to FU. Even so, Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Mendez engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(vi) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured

during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. On October 1, 2014, Ciccone purported to conduct an initial examination of HG at NJ Pain. Ciccone did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Ciccone did not consider any significant number of diagnoses or management options in connection with the examination. This is reinforced by the fact that HG's treatment chart, which was submitted with Ciccone and NJ Pain's bill for the purported initial examination, does not list any diagnosis. Furthermore, neither HG's presenting problems, nor the treatment plan provided to HG by Ciccone and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Ciccone and NJ Pain consisted of medically unnecessary trigger point injections, none of which was health- or life-threatening if properly administered to HG. Even so, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Ciccone engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(vii) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. On October 3, 2014 Mendez purported to conduct an initial examination of HG at NJ Pain. Mendez did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Mendez did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Mendez provided HG with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Mendez provided to virtually every other Insured. Furthermore, neither HG's presenting problems, nor the treatment plan provided to HG by Mendez and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Mendez and NJ Pain consisted of medically unnecessary chiropractic manipulations and computerized range of motion and muscle strength tests, none of which was health- or life- threatening if properly administered to HG. Even so, Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Mendez engaged in some legitimate "moderate complexity" medical decision-making during the purported examination.

(viii) On December 4, 2014, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicates that GB was not injured during the accident. Furthermore, GB did not visit any hospital emergency room following the accident. On December 16, 2014 Micabalo purported to conduct an initial examination of GB at NJ Pain. Micabalo did not retrieve, review, or

analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Micabalo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Micabalo provided GB with substantially the same, phony, boilerplate sprain/strain "diagnoses" that Micabalo provided to virtually every other Insured. Furthermore, neither GB's presenting problems, nor the treatment plan provided to GB by Micabalo and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Micabalo and NJ Pain consisted of medically unnecessary trigger point injections and chiropractic manipulations, none of which was health- or life- threatening if properly administered to GB. Even so, Micabalo, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Micabalo engaged in some legitimate "low complexity" medical decision-making during the purported examination.

(ix) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. On March 16, 2013, Baynes purported to conduct an initial consultation of JS at NJ Pain. Baynes did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with his initial consultation. Moreover, Baynes did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Baynes simply directed JS to "followup with Pain Management." Furthermore, neither JS's presenting problems, nor the treatment plan provided to JS by Baynes and NJ Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, the treatment plan provided by Baynes and NJ Pain consisted of following up with a pain management doctor, which was obviously not health- or life- threatening to JS. Even so, Baynes, Ciccone, Smith, and NJ Pain billed GEICO for the initial examination using CPT code 99245, and thereby falsely represented that Baynes engaged in some legitimate "high complexity" medical decision-making during the purported consultation.

(x) On December 4, 2014, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicates that GB was not injured during the accident. Furthermore, GB did not visit any hospital emergency room following the accident. On April 14, 2015, Baynes purported to conduct an initial consultation of GB at NJ Pain. Baynes did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with his initial consultation. Moreover, Baynes did not consider any significant number of diagnoses or management options in connection with the examination. Even so, Baynes, Ciccone, Smith, and NJ Pain billed GEICO for the initial consultation using CPT code 99245, and thereby falsely represented that

Baynes engaged in some legitimate "high complexity" medical decision-making during the purported consultation.

119. In keeping with the fact that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's purported initial examinations and consultations did not involve any medical decision-making at all, the putative "results" of the initial examinations were fabricated, as shown by the fact that the pre-determined boilerplate "results" of the initial examinations frequently were contravened by contemporaneous police reports and/or hospital records, which indicated that the Insureds did not and could not have suffered from the phony symptomatology reported by NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez.

120. What is more, to the limited extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all as the result of their generally-trivial automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

121. The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

122. Even so, in keeping with the fact that the putative "results" of the examinations were phony, and were falsified to support continued, medically unnecessary treatment by the Defendants, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

123. For example:

(i) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were minor. Even so, following a purported initial examination of JS by Logvinenko on January 19, 2013 – more than three months after the minor accident – Logvinenko, Ciccone, Smith, and NJ Pain falsely reported that JS suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of her minor accident, including neck pain at a level of 8 out of 10 radiating to both shoulders, lower back pain at a level of 8 out of 10, right shoulder pain at a level of 6 out of 10, and restricted range of motion in her spine, all purportedly as a result of JS's minor, more than three month-old automobile accident.

(ii) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were minor. Even so, following a purported initial examination of JS by Mendez on January 21, 2013 – more than three months after the minor accident – Mendez, Ciccone, Smith, and NJ Pain falsely reported that JS suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of his minor accident, including neck pain at a level of 8 out of 10 radiating to both shoulders, upper back pain at a level of 8 out of 10, lower back pain at a level of 8 out of 10 radiating to her right hip, and restricted range of motion in her spine, all purportedly as a result of JS's minor, three month-old automobile accident.

(iii) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were minor. Even so, following a purported initial consultation of JS by Baynes on March 16, 2013 –more than five months after the minor accident – Baynes, Ciccone, Smith, and NJ Pain falsely reported that JS suffered from an absurdly lengthy and severe laundry-list of symptoms including radicular symptoms in the cervical spine, muscle spasms in the lumbar spine, and cervical disc herniation, all purportedly as a result of JS's minor, five month-old automobile accident.

(iv) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the

contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as a result of her minor accident, they were minor. Even so, following a purported initial examination of FU by Ciccone on January 17, 2014, Ciccone, Smith, and NJ Pain falsely reported that FU suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of her minor accident, including cervical pain at a level of 8 out of 10 radiating to both shoulders, arms, and hands, thoracic pain at a level of 8 out of 10, lumbar pain at a level of 8 out of 10, weakness in the right shoulder and right hand, and restricted range of motion in her spine, all purportedly as a result of FU's minor automobile accident.

(v) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as a result of her minor accident, they were minor. Even so, following a purported initial examination of FU by Mendez on January 22, 2014, Mendez, Ciccone, Smith, and NJ Pain falsely reported that FU suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of her minor accident, including neck pain at a level of 9 out of 10 radiating to both shoulders, upper back pain at a level of 9 out of 10, low back pain at a level of 9 out of 10 radiating to her thigh, and restricted range of motion in her spine, all purportedly as a result of FU's minor automobile accident.

(vi) On June 18, 2014, an Insured named EG was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that the airbags did not deploy, the cars were drivable following the accident, EG drove her car from the scene of the accident. Furthermore, EG did not visit any hospital emergency room following the accident. To the extent that EG experienced any health problems at all as the result of her minor accident, they were minor. Even so, following a purported initial examination of EG by Micabalo on September 18, 2014 – three months after the minor accident – Micabalo, Ciccone, Smith, and NJ Pain falsely reported that HG suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of her minor accident, including neck pain at a level of 8 out of 10 radiating to both shoulders, multiple muscle spasms and trigger points in the cervical spine, and restricted range of motion in her spine, all purportedly as a result of EG's minor, three month-old automobile accident.

(vii) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. To the extent that HG experienced any health problems at all as the result of his accident, they were minor. Even so, following a purported initial examination of HG by Ciccone on October 1, 2014, Ciccone, Smith, and NJ Pain falsely reported that HG suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of his accident, including neck pain at a level of 8 out of 10 radiating to both arms, lumbar back pain at a level of 8 out of 10 radiating to both hips, hip pain, multiple muscle spasms and trigger points in the cervical and lumbar spine, and restricted range of motion in his spine, all purportedly as a result of HG's minor automobile accident.

(viii) On September 27, 2014, an Insured named MC was involved in an automobile accident. MC was transported to Trinitas Regional Medical Center where she was briefly observed and discharged with a diagnosis of shoulder pain. The contemporaneous police reports indicate that the airbags in MC's vehicle did not deploy at the time of the accident and the hospital medical records indicate that MC's pain was improving at the time she was discharged. To the extent that MC experienced any health problems as the result of her accident, they were minor. Even so, following a purported initial examination of MC by Ciccone on October 1, 2014, Ciccone, Smith, and NJ Pain falsely reported that MC suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of her accident, including thoracic pain at a level of 8 out of 10, multiple thoracic muscle spasms and trigger points, and trouble standing, sitting, bending, turning, and sleeping, all purportedly as a result of MC's minor automobile accident.

(ix) On September 24, 2014, an Insured named HG was involved in an automobile accident. The contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and HG refused medical attention at the scene of the accident. Furthermore, HG did not visit any hospital emergency room following the accident. To the extent that HG experienced any health problems at all as the result of his accident, they were minor. Even so, following a purported initial examination of HG by Mendez on October 3, 2014, Ciccone, Smith, and NJ Pain falsely reported that HG suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of his accident, including neck pain at a level of 10 out of 10 radiating to his left shoulder, upper back pain at a level of 10 out of 10, low back pain at a level of 8 out of 10, headaches at a pain level of 10 out of 10, and restricted range of motion in his spine, all purportedly as a result of HG's minor automobile accident.

(x) On December 4, 2014, an Insured named GB was involved in an automobile accident. The contemporaneous police report indicates that GB was not injured during the accident. Furthermore, GB did not visit any hospital emergency room

following the accident. To the extent that GB experienced any health problems at all as the result of his accident, they were minor. Even so, following a purported initial examination of GB by Micabalo on December 16, 2014, Micabalo, Ciccone, Smith, and NJ Pain falsely reported that GB suffered from an absurdly lengthy and severe laundry-list of symptoms as the result of his accident, including neck pain at a level of 6 out of 10, thoracic pain at a level of 6 out of 10, lumbar pain at a level of 7 out of 10, knee pain at a level of 7 out of 10, ankle pain at a level of 7 out of 10, and cervical, thoracic, and lumbar muscle spasms, all purportedly as a result of GB's minor automobile accident.

124. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

125. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

126. As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

127. It is extremely improbable that any two Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

128. It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds purportedly presenting at NJ Pain with substantially identical injuries <u>on the exact same dates</u> weeks or even many months after their accidents.

129. Even so, in keeping with the fact that NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, Baynes, and Mendez's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NJ

Pain, Ciccone, Smith, Micabolo, and Mendez frequently issued substantially identical, phony "diagnoses", often on or about the exact same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

130. For example:

(i) On July 3, 2013, two Insureds – SD and VW – were involved in the same automobile accident. Less than two weeks later, SD and VW presented – incredibly – on the exact same date, July 12, 2013, to NJ Pain for initial examinations by Micabalo. SD and VW were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Micabalo provided SD and VW with substantially identical, phony neck and lumbar sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ii) On September 6, 2013, two Insureds – LA and MA – were involved in the same automobile accident. More than four months later, LA and MA presented – incredibly – on the exact same date, January 24, 2014, to NJ Pain for initial examinations by Micabalo. LA and MA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. What is more, to the extent that LA and MA were injured at all in their accident, their injuries would have resolved, and resolved differently, over the more than four months that had elapsed following their accident. Even so, at the conclusion of the putative initial examinations, Micabalo provided MA and LA with substantially identical, phony neck and lumbar sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iii) On December 6, 2013, two Insureds – BC and JV – were involved in the same automobile accident. Almost nine months later, on August 28, 2014, JV presented to NJ Pain for an initial examination by Micabalo, and four months thereafter, on January 8, 2015, BC presented to NJ Pain for an initial examination by Micabalo. BC and JV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. What is more, any injuries that BC and JV actually did sustain in the accident would have resolved, and resolved differently, over the nine-to-13 months that elapsed prior to their examinations by Micabalo. Even so, at the conclusion of the putative initial examinations, Micabalo provided BC and JV with substantially identical, phony cervical and lumbar disc displacement "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iv) On January 16, 2014 two Insureds – DR and DR – were involved in the same

automobile accident. Less than one month later, DR and DR presented on January 24, 2014 and February 12, 2014 respectively, to NJ Pain for initial examinations by Mendez. DR and DR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Mendez provided DR and DR with substantially identical, phony neck sprain and thoracic sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(v) On February 24, 2014 two Insureds – DJ and CH – were involved in the same automobile accident. DJ and CH presented – exactly one week apart, on March 6, 2014 and March 13, 2014, to NJ Pain for initial examinations by Micabalo. DJ and CH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Micabalo provided DJ and CH with substantially identical, phony lumbar sprain and neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vi) On May 18, 2014 two Insureds – MA and AC – were involved in the same automobile accident. Almost five months later, MA and AC presented – incredibly – on the exact same date, October 8, 2014, to NJ Pain for initial examinations by Ciccone. MA and AC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. What is more, any injuries MA and AC actually did sustain in their accident would have resolved, and resolved differently, over the almost five months that elapsed since their accident. Even so, at the conclusion of the putative initial examinations, Ciccone provided MA and AC with substantially identical, phony lumbosacral sprain and neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vii) On June 8, 2014 two Insureds – AB and GB – were involved in the same automobile accident. Less than one month later, AB and GB presented – incredibly – on the exact same date, June 25, 2014, to NJ Pain for initial examinations by Ciccone. AB and GB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Ciccone provided AB and GB with substantially identical, phony lumbosacral sprain and neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(viii) On June 8, 2014 two Insureds – AB and GB – were involved in the same automobile accident. Less than one month later, AB and GB presented on June 27, 2014 and June 30, 2014, respectively, to NJ Pain for initial examinations by Mendez. AB and GB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Mendez provided AB and GB

with substantially identical, phony lumbar sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ix) On April 16, 2014 two Insureds – LL and PL – were involved in the same automobile accident. More than four months later, LL and PL presented – incredibly – on the exact same date, August 21, 2014, to NJ Pain for initial examinations by Micabalo. LL and PL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. What is more, any injuries LL and PL actually did sustain in their accident would have resolved, and resolved differently, over the more than four months that elapsed since their accident. Even so, at the conclusion of the putative initial examinations, Micabalo provided LL and PL with substantially identical, phony "disturbance of skin sensation", lumbosacral sprain, and lumbar sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(x) On August 12, 2014, two Insureds – MC and RC – were involved in the same automobile accident. Nearly two months later, MC and RC presented – incredibly – on the exact same date, October 8, 2014, to NJ Pain for initial examinations by Ciccone. MC and RC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Ciccone provided MC and RC with substantially identical, phony neck and lumbosacral sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xi) On September 27, 2014, two Insureds – AF and MF – were involved in the same automobile accident. Less than one week later, AF and MF presented – incredibly – on the exact same date, October 3, 2014, to NJ Pain for initial examinations by Mendez. AF and MF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Mendez provided AF and MF with substantially identical, phony neck and lumbar sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xii) On January 19, 2015 two Insureds – LT and PS – were involved in the same automobile accident. More than three months later, LT and PS presented on May 14, 2015 and May 28, 2015 respectively, to NJ Pain for initial examinations by Micabalo. LT and PS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. What is more, any injuries LT and PS actually did sustain in their accident would have resolved, and resolved differently, over the more than three months that elapsed since their accident. Even so, at the conclusion of the putative initial examinations, Micabalo provided LT and PS with substantially identical lumbosacral sprain and neck sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

131. These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, and Mendez frequently issued substantially identical "diagnoses", often on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

132. NJ Pain, Ciccone, Smith, Micabalo, and Mendez routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to provide to the Insureds.

133. In keeping with the fact that NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, Baynes, and Mendez's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, and Mendez frequently falsified range of motion data in their initial examination and consultation reports.

134. The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

135. A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a range of motion test, the physician or chiropractor asks the patient to move his or her joints at various angles, or the physician or

chiropractor moves the joints. The physician or chiropractor then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

136. Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician or chiropractor knows the extent of a given patient's joint impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

137. NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, and Mendez purported to provide range of motion testing during virtually every initial examination and consultation that they purported to provide to Insureds.

138. In actuality, however, NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, and Mendez simply fabricated range of motion data for the Insureds and included it in the initial examination and consultation reports in order to create the appearance of genuine injuries, where none actually existed.

139. It is improbable that an individual Insured's range of motion would fluctuate by more than 20 percent over the course of just a few days.

140. It is even more improbable, to the point of impossibility, that this would occur over and over again.

141. In a legitimate clinical setting, if two physicians or chiropractors within a single healthcare practice identified dramatically different ranges of motion in a single patient over the

course of just a few days, the inconsistencies within the range of motion results would be documented and addressed in the physicians' and chiropractors' treatment notes.

142. In keeping with the fact that NJ Pain, Ciccone, Smith, Micabolo, Logvinenko, and Mendez simply fabricated range of motion data for the Insureds and included it in the initial examination and consultation reports in order to create the appearance of genuine injuries, where none actually existed, the range of motion data they fabricated for one or another Insured frequently varied significantly from contemporaneous range of motion data that they generated for those same Insureds.

143. In such instances, the disparities in the range of motion data were not addressed in any way in the Insureds' treatment reports.

144. For example:

(i) On November 8, 2012, Micabalo purported to perform an initial examination of an Insured named WC, and reported that WC had cervical flexion that was 90 percent of normal, cervical extension that was approximately 83 percent of normal, and cervical rotation that was approximately 88 percent of normal. Just two days later, on November 10, 2012, Mendez purported to perform an initial examination of WC, and reported that WC had far more serious range of motion deficits, including cervical flexion that was 40 percent of normal, cervical extension that was approximately eight percent of normal, and cervical rotation that was approximately 38-50 percent of normal. Though Micabalo and Mendez reported dramatic differences in WC's range of motion over the course of just two days, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(ii) On June 3, 2013, Micabalo purported to perform an initial examination of an Insured named MN, and reported that MN had lumbar flexion that was approximately 88 percent of normal, lumbar extension that was 80 percent of normal, and lumbar lateral flexion that was 80 percent of normal. Just five days later, on June 8, 2013, Mendez purported to perform an initial examination of MN, and reported that MN had far more serious range of motion deficits, including lumbar flexion that was approximately 33 percent of normal, lumbar extension that was 20 percent of normal, and lumbar lateral flexion that was 20-40 percent of normal. Though Micabalo and Mendez reported dramatic differences in MN's range of motion over the course of just five days, neither of them

commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(iii) On June 3, 2013, Micabalo purported to perform an initial examination of an Insured named ER, and reported that ER had cervical flexion that was 90 percent of normal, cervical extension that was approximately 83 percent of normal, cervical lateral flexion that was between approximately 89-100 percent of normal, lumbar flexion that was approximately 88 percent of normal, and lumbar extension that was 80 percent of normal. Just five days later, on June 8, 2013, Mendez purported to perform an initial examination of ER, and reported that ER had far more serious range of motion deficits, including cervical flexion that was 50 percent of normal, cervical extension that was approximately 25-33 percent of normal, cervical lateral flexion that was between approximately 33-44 percent of normal, lumbar flexion that was 25 percent of normal, and lumbar extension that was between 0-20 percent of normal. Though Micabalo and Mendez reported dramatic differences in ER's range of motion over the course of just five days, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(iv) On December 11, 2013, Ciccone purported to perform an initial examination of an Insured named LB, and reported that LB had lumbar flexion that was approximately 83 percent of normal, and lumbar extension that was 60 percent of normal. Just one week later, on December 18, 2013, Mendez purported to perform an initial examination of LB, and reported that LB had far more serious range of motion deficits, including lumbar flexion that was approximately 25-33 percent of normal, and lumbar extension that was 20 percent of normal. Though Ciccone and Mendez reported dramatic differences in LB's range of motion over the course of just one week, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(v) On January 19, 2013, Logvinenko purported to perform an initial examination of an Insured named JS, and reported that JS had cervical flexion that was 100 percent of normal, cervical extension that was approximately 83 percent of normal, lumbar flexion that was 100 percent of normal, and lumbar extension that was 80 percent of normal. Just two days later, on January 21, 2013, Mendez purported to perform an initial examination of JS, and reported that JS had far more serious range of motion deficits, including cervical flexion that was just 70 percent of normal, cervical extension that was approximately 58-67 percent of normal, lumbar flexion that was approximately 67 percent of normal, and lumbar extension that was 60 percent of normal. Though Logvinenko and Mendez reported dramatic differences in JS's range of motion over the course of just two days, neither of them commented upon or addressed these disparate "findings" in

their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(vi) On March 4, 2013, Micabalo purported to perform an initial examination of an Insured named DF, and reported that DF had cervical flexion that was 90 percent of normal, cervical extension that was approximately 92 percent of normal, and lateral flexion that was approximately 89 percent of normal. Just two days later, on March 6, 2013, Mendez purported to perform an initial examination of DF, and reported that DF had far more serious range of motion deficits, including cervical flexion that was just 60 percent of normal, cervical extension that was just 50 percent of normal, and lateral flexion that was between approximately 44 percent and 67 percent of normal. Though Micabalo and Mendez reported dramatic differences in DF's range of motion over the course of just two days, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(vii) On January 17, 2014, Ciccone purported to perform an initial examination of an Insured named FU, and reported that FU had cervical flexion that was 80 percent of normal, cervical extension that was approximately 83 percent of normal, and lumbar flexion that was approximately 83 percent of normal. Just five days later, on January 22, 2014, Mendez purported to perform an initial examination of FU, and reported that FU had far more different range of motion deficits, including cervical flexion that was 50 percent of normal, cervical extension that was approximately 42 percent of normal, and lumbar flexion that was 25 percent of normal. Though Ciccone and Mendez reported dramatic differences in FU's range of motion over the course of just five days, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

(viii) On January 24, 2014, Mendez purported to perform an initial examination of an Insured named DR, and reported that DR had cervical flexion that was 70 percent of normal, and lumbar flexion that was only approximately 17 percent of normal. That same day, on January 24, 2014, Micabalo purported to perform an initial examination of DR, and reported that DR had far more different range of motion deficits, including cervical flexion that was just 40 percent of normal, and lumbar flexion that was approximately 67 percent of normal. Though Micabalo and Mendez reported dramatic differences in DR's range of motion over the course of a single day, neither of them commented upon or addressed these disparate "findings" in their subsequent treatment notes. This is because the range of motion data, like the "diagnoses" that were predicated upon the range of motion data, were phony.

145. In the claims for initial examinations and consultations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely represented that the initial examinations involved "high complexity" (when billed under CPT code 99245), "moderate complexity" (when billed under CPT code 99204) or "low complexity" (when billed under CPT code 99203) medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99245, 99204 and 99203, because examinations billable under CPT codes 99245, 99204 and 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

146. In the claims for initial examinations identified in Exhibit "1", NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez also routinely falsely represented that the putative initial examinations involved "high complexity" (when billed under CPT code 99245), "moderate complexity" (when billed under CPT code 99204) or "low complexity" (when billed under CPT code 99203) medical decision-making in order to create a false basis for the laundry list of other Fraudulent Services that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to provide to the Insureds, including follow-up examinations, chiropractic services, electrodiagnostic testing, PNT treatments, and trigger point injections.

**5. Misrepresentations Regarding the Reimbursable Amount for the Initial Examinations**

147. As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

148. Not only did NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely misrepresent the severity of the presenting problems of the Insureds, misrepresent the amount of time spent on the examinations and consultations, and misrepresent

the extent of any medical decision-making, but they also routinely misrepresented the reimbursable amount for the initial examinations and consultations.

149. To maximize the amount of fraudulent billing that they could submit to GEICO and other automobile insurers for their fraudulent initial examinations and consultations, NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez routinely misrepresented the reimbursable amount for the initial examinations and consultations.

150. Specifically, as set forth in Exhibit "1", NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez typically billed for their putative initial examinations and consultations using CPT codes 99203, 99204, or 99245.

151. The maximum reimbursable amount for CPT code 99203 was: (i) $78.01, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $109.29, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $126.87, pursuant to the Fee Schedule that was in effect after January 4, 2013.

152. The maximum reimbursable amount for CPT code 99204 was: (i) $111.44, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $153.97, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $193.64, pursuant to the Fee Schedule that was in effect after January 4, 2013.

153. The maximum reimbursable amount for CPT code 99245 was: (i) $222.18, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $250.29, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $252.93, pursuant to the Fee Schedule that was in effect after January 4, 2013.

154. Even so, and as set forth above in Exhibit "1", in their claims for initial examinations and consultations, NJ Pain, Ciccone, Micabalo, Logvinenko, Baynes, and Mendez

routinely falsely represented that they were entitled to be paid: (a) $300.00 for initial examinations under CPT code 99203; (b) $375.00 for initial examinations under CPT code 99204; and (c) $475.00 for initial consultations under CPT code 99245.

155. For example:

(i) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named WC on November 10, 2012.

(ii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named KC on January 10, 2013.

(iii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named JS on January 19, 2013.

(iv) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named SU on February 2, 2013.

(v) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $475.00 under CPT code 99245 for an initial consultation they purported to provide to an Insured named JS on March 16, 2013.

(vi) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named LC on April 19, 2013.

(vii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named MV on July 11, 2013.

(viii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named OJ on October 9, 2013.

(ix) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $475.00 under CPT code 99245 for an initial consultation they purported to provide to an Insured named SD on October 12, 2013.

(x) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named CV on December 23, 2013.

(xi) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named AH on January 18, 2014.

(xii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named MA on January 24, 2014.

(xiii) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $475.00 under CPT code 99245 for an initial consultation they purported to provide to an Insured named DR on January 30, 2014.

(xiv) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named DR on February 12, 2014.

(xv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named OB on February 14, 2014.

(xvi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named CM on March 12, 2014.

(xvii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named SL on May 14, 2014.

(xviii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named JB on May 22, 2014.

(xix) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named JR on June 20, 2014.

(xx) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $475.00 under CPT code 99245 for an initial consultation they purported to provide to an Insured named FM on June 25, 2014.

(xxi) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named AB on June 27, 2014.

(xxii) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $475.00 under CPT code 99245 for an initial consultation they purported to provide to an Insured named TR on October 3, 2014.

(xxiii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named RC on October 8, 2014.

(xxiv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named JM on December 22, 2014.

(xxv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $300.00 under CPT code 99203 for an initial examination they purported to provide to an Insured named NR on March 19, 2015.

156. These are only representative examples. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez almost always represented that they were entitled to be reimbursed for their putative initial examinations and consultations in amounts far in excess of the amounts set forth in the Fee Schedule.

157. Each and every time that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez falsely represented that they were entitled to be reimbursed for their putative initial examinations and consultations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

158. In the claims identified in Exhibit "1" NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely falsely represented that they were entitled to be reimbursed for their putative initial examinations and consultations in amounts far in excess of

the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**C. The Fraudulent Follow-Up Examinations at NJ Pain**

159. In addition to their fraudulent initial examinations and consultations, NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes typically purported to subject the Insureds in the claims identified in Exhibit "1" to multiple fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

160. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely billed the follow-up examinations through NJ Pain to GEICO under CPT codes 99212, 99213, or 99214.

161. The charges for the follow-up examinations in the claims identified in Exhibit "1" were fraudulent in that they misrepresented NJ Pain's eligibility to collect PIP Benefits in the first instance.

162. In fact, NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither they nor the follow-up examinations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

163. In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations also were fraudulent in that the follow-up examinations were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes' fraudulent treatment and billing protocol.

164. The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent, nature, and reimbursable amount for the follow-up examinations.

**1. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

165. Pursuant to the CPT Assistant, the use of CPT code 99214 typically requires that the Insured present with problems of moderate to high severity.

166. The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

167. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i) Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii) Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii) Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv) Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v) Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi) Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii) Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii) Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

168. Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

169. In addition, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

170. The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

171. For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i) Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii) Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii) Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv) Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v) Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi) Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii) Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

172. Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

173. By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

174. In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in most of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

175. To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

176. Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

177. As set forth above, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

178. By the time the Insureds in the claims identified in Exhibit "1" presented to NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

179. Even so, in the claims for follow-up examinations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely billed for their putative follow-up examinations under CPT codes 99214 and 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity, or low to moderate severity.

180. For example:

(i) On November 10, 2012, an Insured named JW was involved in an automobile accident. The contemporaneous police report indicates that no one was injured and JW refused medical treatment at the scene of the accident. Even so, later that day, JW presented to Meadowlands Hospital where he complained of a headache but denied experiencing any neck or back pain. JW was examined and discharged on the same day with a head bruise diagnosis. To the extent that JW experienced any health problems at all as the result of his accident, they were of low severity at the outset, and had completely resolved within four weeks of the accident. Even so, following purported follow-up examinations of JW on January 2, 2013, January 30, 2013, and March 1, 2013 – between two and four months after the accident – Micabalo, Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that JW presented with problems of low to moderate severity at the aforementioned follow-up examinations.

(ii) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident, and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within four weeks of the minor accident. Even so, following purported follow-up examinations of JS on February 13, 2013, February 18, 2013, March 14, 2013, April 17, 2013, May 15, 2013, May 22, 2013, June 26, 2013, and July 17, 2013 – between four and nine months after the minor accident – Mendez, Logvinenko,

Ciccone, Smith, and NJ Pain billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that JS presented with problems of low to moderate severity, at the aforementioned follow-up examinations.

(iii) On July 16, 2013, an Insured named OM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags did not deploy, OM's car was drivable following the accident, OM drove his car from the accident site, and OM refused medical treatment at the scene of the accident. Even so, OM presented later that day at Palisades Medical Center where he was briefly observed, and then discharged with a minor sprain/strain diagnosis. The hospital medical records indicate that OM's symptoms were mild and improving at the time he was discharged. To the extent OM experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within four weeks of the minor accident. Even so, following purported follow-up examinations of OM on August 30, 2013, October 2, 2013, October 30, 2013, November 13, 2013, and November 20, 2013 – between one and five months after the minor accident – Mendez, Ciccone, Smith, and NJ Pain billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that OM presented with problems of moderate to high severity, or low to moderate severity, at the aforementioned follow-up examinations.

(iv) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within four weeks of the minor accident. Even so, following purported follow-up examinations of FU on January 22, 2014, January 29, 2014, February 12, 2014, February 14, 2014 February 19, 2014, February 26, 2014, March 5, 2014, March 26, 2014, April 2, 2014, April 16, 2014, April 21, 2014, May 7, 2014, May 14, 2014, and June 4, 2014 – between one and six months after the minor accident – Ciccone, Smith, Mendez, and NJ Pain billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that FU presented with problems of moderate to high severity, or low to moderate severity, at the aforementioned follow-up examinations.

(v) On May 11, 2013, an Insured named CV was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured during the accident, the airbags did not deploy, and the cars were drivable following the

accident. Furthermore, CV did not visit any hospital emergency room following the accident. To the extent that CV experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within four weeks of the minor accident. Even so, following purported follow-up examinations of CV on January 29, 2014, February 26, 2014, March 7, 2014, April 22, 2014, May 14, 2014, May 17, 2014, March 5, 2014, March 11, 2014, March 31, 2014, June 25, 2014, and July 26, 2014 – between nine and fifteen months after the minor accident – Ciccone, Smith, Baynes, Micabalo, and NJ Pain billed GEICO for the follow-up examinations using CPT codes 99213 and 99214, and thereby falsely represented that CV presented with problems of moderate to high severity, or low to moderate severity, at the aforementioned follow-up examinations.

181. These are only representative examples. In the claims for follow-up examinations that are identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely falsely represented that the Insureds continued to suffer from presenting problems of moderate to high severity, or low to moderate severity, months after their minor underlying accidents.

**2. Misrepresentations Regarding the Results of the Follow-Up Examinations**

182. What is more, pursuant to the Fee Schedule, when NJ Pain, Ciccone, Smith, Micabalo, Mendez, and Baynes submitted charges for the follow-up examinations under CPT code 99214, they represented that they provided at least two of the following three components: (i) a "detailed" patient history; (ii) a "detailed" physical examination; and (iii) medical decision-making of "moderate complexity".

183. In addition, and pursuant to the Fee Schedule, when NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes billed for their putative follow-up examinations under CPT code 99213, they represented that they provided at least two of the following three components: (i) an "expanded problem focused" patient history; (ii) an "expanded problem focused physical examination"; and (iii) medical decision-making of "low complexity".

184. In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical-decision making at all.

185. Rather, following their purported follow-up examinations, NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds continue to return to NJ Pain for additional unnecessary follow-up examinations, chiropractic services, electrodiagnostic testing, PNT treatments, and trigger point injections.

**3. Misrepresentations Regarding the Reimbursable Amount for the Follow Up Examinations**

186. As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

187. Not only did NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely falsely misrepresent the severity of the presenting problems of the Insureds, and misrepresent the results of the follow-up examinations, but they also routinely misrepresented the reimbursable amount for the follow-up examinations.

188. To maximize the amount of fraudulent billing that they could submit to GEICO and other automobile insurers for their fraudulent follow-up examinations, NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez routinely misrepresented the reimbursable amount for the follow-up examinations.

189. Specifically, as set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes typically billed for their putative follow-up examinations

using CPT codes 99212, 99213, or 99214.

190. The maximum reimbursable amount for CPT code 99212 was: (i) $36.72, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $44.12, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $51.69, pursuant to the Fee Schedule that was in effect after January 4, 2013.

191. The maximum reimbursable amount for CPT code 99213 was: (i) $46.92, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $59.87, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $85.01, pursuant to the Fee Schedule that was in effect after January 4, 2013.

192. The maximum reimbursable amount for CPT code 99214 was: (i) $68.00, pursuant to the Fee Schedule that was in effect from April 7, 2003 and August 9, 2009; (ii) $93.57, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (iii) $125.71, pursuant to the Fee Schedule that was in effect after January 4, 2013.

193. Even so, and as set forth above in Exhibit "1", in their claims for follow up examinations, NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely falsely represented that they were entitled to be paid: (a) $150.00 for follow up examinations under CPT code 99212; (b) $200.00 for follow up examinations under CPT code 99213; and (c) $250.00 for follow up examinations under CPT code 99214.

194. For example:

(i) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named LL on January 2, 2013.

(ii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up

examination they purported to provide to an Insured named KC on February 6, 2013.

(iii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named VW on December 11, 2013.

(iv) Mendez , Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named LS on December 30, 2013.

(v) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $250.00 under CPT code 99214 for a follow up examination they purported to provide to an Insured named DF on January 18, 2014.

(vi) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named NH on January 24, 2014.

(vii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $250.00 under CPT code 99214 for a follow up examination they purported to provide to an Insured named DR on January 29, 2014.

(viii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named MS on February 10, 2014.

(ix) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named DR on February 19, 2014.

(x) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named JD on March 5, 2014.

(xi) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named ER on March 10, 2014.

(xii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named CP on March 21, 2014.

(xiii) Baynes, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $250.00 under CPT code 99214 for a follow up examination they purported to provide to an Insured named IC on March 22, 2014.

(xiv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named JG on April 10, 2014.

(xv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named AT on May 22, 2014.

(xvi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named CV on June 25, 2014.

(xvii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named AT on July 3, 2014.

(xviii) Mendez, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $200.00 under CPT code 99213 for a follow up examination they purported to provide to an Insured named GB on July 23, 2014.

(xix) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named CM on September 16, 2014.

(xx) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $150.00 under CPT code 99212 for a follow up examination they purported to provide to an Insured named AB on March 23, 2015.

195. These are only representative examples. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes almost always represented that they were entitled to be reimbursed for their putative follow up examinations in amounts far in excess of the amounts set forth in the Fee Schedule.

196. Furthermore, the No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with chiropractic and physical therapy treatments if one of the following four circumstances is present:

(i) there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

(ii) the patient fails to respond to treatment, requiring a change in the treatment plan;

(iii) the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv) it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

197. Even so, NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely billed for follow-up examinations contemporaneously with chiropractic and physical therapy treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; or (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

198. For example:

(i) NJ Pain, Ciccone, Smith, Mendez, and Logvinenko billed GEICO for follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named KC on February 6, 2013, February 27, 2013, March 15, 2013, June 3, 2013, June 29, 2013, and July 12, 2013 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which NJ Pain, Ciccone, Smith, Mendez, and Logvinenko were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii) NJ Pain, Ciccone, Smith, Mendez, Logvinenko, and Baynes billed GEICO for follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named SU

on March 2, 2013, March 9, 2013, April 6, 2013, April 13, 2013, May 13, 2013, June 10, 2013, June 22, 2013, July 10, 2013, and August 14, 2013 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which NJ Pain, Ciccone, Smith, Mendez, Logvinenko, and Baynes were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii) NJ Pain, Ciccone, Smith, Mendez, and Micabalo billed GEICO for follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named LC on May 13, 2013, June 19, 2013; June 24, 2013, July 17, 2013, July 22, 2013, and August 26, 2013 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which NJ Pain, Ciccone, Smith, Mendez, and Micabalo were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv) NJ Pain, Ciccone, Smith, and Mendez billed GEICO for follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AB on July 23, 2014, July 30, 2014, August 1, 2014, August 6, 2014, August 13, 2014, August 20, 2014, August 27, 2014, September 3, 2014, and September 17, 2014 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which NJ Pain, Ciccone, Smith, and Mendez were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v) NJ Pain, Ciccone, Smith, Mendez, and Baynes billed GEICO for follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named SC on August 9, 2014, August 29, 2014, September 3, 2014, September 6, 2014, September 10, 2014, September 14, 2014, September 24, 2014, and October 3, 2014 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of

any situation in which the patient's condition became permanent, or a situation in which NJ Pain, Ciccone, Smith, Mendez, and Baynes were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

199. These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes almost always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic and/or physical therapy services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

200. Each and every time that NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes falsely represented that they were entitled to be reimbursed for their putative follow up examinations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

201. In the claims identified in Exhibit "1" NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes routinely falsely represented that they were entitled to be reimbursed for their putative follow-up examinations in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

### D. The Fraudulent Computerized Range of Motion and Muscle Strength Tests at NJ Pain

202. In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at NJ Pain, Ciccone, Smith, and Micabalo instructed many Insureds to return for one or more rounds of medically useless computerized range of motion and muscle strength tests.

203. Ciccone or Micabalo purported to personally perform the computerized range of motion and muscle strength tests in the claims identified in Exhibit "1".

204. As set forth in Exhibit "1", Ciccone, Smith, Micabalo, and NJ Pain then billed the computerized range of motion tests to GEICO under CPT code 95851, and the computerized muscle strength tests to GEICO under CPT code 95831, typically resulting in over $700.00 in charges for every Insured who supposedly received the tests.

205. The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

206. Moreover, in the claims for the computerized range of motion and muscle strength tests identified in Exhibit "1", the charges for the computerized range of motion and muscle strength tests were fraudulent in that they misrepresented NJ Pain's eligibility to collect PIP Benefits in the first instance.

207. In fact, NJ Pain was never eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither NJ Pain nor the computerized range of motion and muscle strength tests were in

compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

### 1. Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

208. The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

209. The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

210. A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

211. Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

212. Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with NJ Pain – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

213. Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

214. In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

**2. The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests**

215. To the extent that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez actually provided initial examinations and follow-up examinations in the first instance, physicians and chiropractors associated with NJ Pain purported to conduct manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

216. The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and

Mendez routinely submitted for the initial examinations under CPT codes 99203, 99204, and 99245, and for the follow-up examinations under CPT codes 99212, 99213, and 99214.

217. Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Ciccone, Smith, Micabalo, and NJ Pain systematically billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to many Insureds.

218. Though the Insureds routinely visited NJ Pain several times per month for follow-up examinations and other Fraudulent Services, Ciccone, Smith, Micabalo, and NJ Pain often deliberately scheduled separate appointments for computerized range of motion and muscle strength tests so that they could bill for those procedures separately, without having to include them in the billing for the initial and follow-up examinations, as required by the Fee Schedule.

219. Ciccone, Smith, Micabalo, and NJ Pain purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

220. Ciccone, Smith, Micabalo, and NJ Pain purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary

object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

221. The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

222. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Ciccone, Smith, Micabalo, nor any other healthcare provider associated with NJ Pain, ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

223. The computerized range of motion and muscle strength tests were part and parcel of NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez.

224. In keeping with the fact that the computerized range of motion tests were medically unnecessary, New Jersey law actually prohibits physicians such as Micabalo, Smith, and Ciccone from billing for computerized range of motion tests.

225. Specifically, N.J.A.C. 13:35-2.6(c) provides, in pertinent part, that no practitioner "shall bill for any diagnostic tests which fail to yield data of sufficient clinical value in the development, evaluation or implementation of a plan of treatment, including the following: … Computer supported range of motion tests."

226. In the claims for computerized range of motion testing under CPT code 95851 that are identified in Exhibit "1", each such charge constituted a separate violation of N.J.A.C. 13:35-2.6(c).

### 3. The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests

227. Not only did Ciccone, Smith, Micabalo, and NJ Pain deliberately purport to provide duplicative, medically unnecessary, computerized range of motion and muscle tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit through NJ Pain to GEICO.

228. Pursuant to the CPT Assistant, when range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

229. CPT code 97750 is a "time-based" code that – in New Jersey – allows for a maximum charge of $55.79 for every 15 minutes of testing that is performed.

230. Thus, if a healthcare provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $55.79 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle

testing, it would be permitted to submit two charges of $55.79 under CPT code 97750, resulting in total charges of $111.58. If the provider performed 45 minutes of computerized range of motion and muscle testing, it would be permitted to submit three charges of $55.79 under CPT code 97750, resulting in total charges of $167.37, and so forth.

231. In the claims for computerized range of motion and muscle tests that are identified in Exhibit "1", Ciccone, Smith, Micabalo, and NJ Pain virtually always purported to provide the computerized range of motion and muscle strength tests to Insureds together, on the same dates of service.

232. To the extent that Ciccone, Smith, Micabalo, and NJ Pain actually provided the computerized range of motion and muscle strength tests to Insureds in the first instance, the computerized range of motion tests and muscle strength tests – together – never took more than 15 minutes to perform.

233. Thus, even if the computerized range of motion and muscle strength tests that Ciccone, Smith, Micabalo, and NJ Pain purported to provide were medically necessary, and performed in the first instance, Ciccone, Smith, Micabalo, and NJ Pain would be limited to a single, time-based charge of $55.79 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle strength tests on an Insured.

234. In order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, Ciccone, Smith, Micabalo, and NJ Pain unbundled what should have been – at most – a single charge of $55.79 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges under CPT code 95831 (for the muscle tests); and multiple charges under CPT code 95851 (for the range of motion tests).

235. By unbundling what should – at most – have been a single $55.79 charge under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, Ciccone, Smith, Micabalo, and NJ Pain generally submitted charges of more than $700.00 per Insured, and often much more, for each round of computerized range of motion and muscle testing they purported to provide.

236. For example:

(i) On July 26, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named VW. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(ii) On July 31, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named SD. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(iii) On August 16, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named OM. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(iv) On September 23, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named LS. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(v) On November 4, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named

SC. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(vi) On November 5, 2013, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named EP. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(vii) On January 15, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named EP. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(viii) On January 20, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named CV. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(ix) On January 29, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named FU. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(x) On February 7, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named LB. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $740.00.

(xi) On February 21, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named CP. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xii) On March 7, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named MA. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xiii) On March 28, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named TK. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xiv) On April 16, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named FU. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xv) On May 15, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named AT. To the extent that they provided the test in the first instance, the tests – collectively -- took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xvi) On May 19, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named WG. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo

unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $740.00.

(xvii) On June 11, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named TA. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,110.00.

(xviii) On June 11, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named AI. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

(xix) On August 8, 2014, Micabalo, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named MC. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Micabalo unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,110.00.

(xx) On August 27, 2014, Ciccone, Smith, and NJ Pain purported to provide computerized range of motion and muscle testing to an Insured named JR. To the extent that they provided the test in the first instance, the tests – collectively – took less than 15 minutes to perform. Even so, instead of submitting a single charge of $55.79 for the tests under CPT code 99750, NJ Pain and Ciccone unbundled the charges into multiple charges under CPT codes 95831 and 95851, resulting in total charges of $1,850.00.

237. These are only representative examples. In all of their claims for computerized range of motion and muscle testing identified in Exhibit "1", Ciccone, Smith, Micabalo, and NJ Pain fraudulently unbundled what should have, at most, been a single charge of $55.79 under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, solely in order to increase their already fraudulent billing for the computerized range of motion and muscle strength tests.

238. Each such act of unbundling falsely represented the amount of time that was spent on the tests, and the reimbursable amount for the tests, and constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

**E. The Fraudulent Electrodiagnostic Testing at NJ Pain**

239. Pursuant to the phony, boilerplate "diagnoses" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided during their fraudulent initial and follow-up examinations and consultations, NJ Pain, Ciccone, Smith, and Micabalo purported to subject the vast majority of Insureds in the claims identified in Exhibit "1" to medically unnecessary electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests (collectively "electrodiagnostic" or "EDX" testing).

240. Ciccone and Micabalo purported to perform virtually all of the EDX tests that were billed to GEICO through NJ Pain.

241. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, and Micabalo then billed the EDX tests to GEICO under CPT codes 95885, 95886, 95909, 95910, 95911, 95912, and 95913, generally resulting in combined charges of at least $3,000.00 for each Insured on whom the EDX testing purportedly was performed.

242. In the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all –pursuant to the phony "diagnoses" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided to the Insureds at the conclusion of the putative initial examinations and consultations.

243. Moreover, in the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that they misrepresented NJ Pain's eligibility to collect PIP

Benefits in the first instance.

244. In fact, NJ Pain never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither NJ Pain nor the EDX tests were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1. The Human Nervous System and Electrodiagnostic Testing**

245. The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

246. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.

247. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

248. EMG tests and NCV tests both are forms of electrodiagnostic tests, and purportedly were provided by NJ Pain, Ciccone, Smith, and Micabalo because they were medically necessary to determine whether the Insureds had radiculopathies.

249. The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

250. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**2. The Fraudulent NCV Tests**

251. NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

252. In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be

compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

253. There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

254. F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

255. According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

256. Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, NJ Pain, Ciccone, Smith, and Micabalo routinely purported to test far more nerves than recommended by the Recommended Policy.

257. For example:

(i) On May 9, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 11 motor and/or sensory nerves of an Insured named AS, and on May 16, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 7 motor and/or sensory nerves of AS, supposedly to determine whether AS suffered from a radiculopathy.

(ii) On September 14, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 7 motor and/or sensory nerves of an Insured named OM, and on September 18, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 11 motor and/or

sensory nerves of OM, supposedly to determine whether OM suffered from a radiculopathy.

(iii) On September 27, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 7 motor and/or sensory nerves of an Insured named SD, and on October 4, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 11 motor and/or sensory nerves of SD, supposedly to determine whether SD suffered from a radiculopathy.

(iv) On April 2, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named CM, supposedly to determine whether CM suffered from a radiculopathy.

(v) On April 4, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named FM, supposedly to determine whether FM suffered from a radiculopathy.

(vi) On April 30, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named CM, supposedly to determine whether CM suffered from a radiculopathy.

(vii) On May 16, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named CH, supposedly to determine whether CH suffered from a radiculopathy.

(viii) On June 11, 2014, NJ Pain, Ciccone, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named AI, supposedly to determine whether AI suffered from a radiculopathy.

(ix) On May 16, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named CP, supposedly to determine whether CP suffered from a radiculopathy.

(x) On September 3, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named GB, supposedly to determine whether GB suffered from a radiculopathy.

(xi) On September 18, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named PL, and on October 9, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of PL, supposedly to determine whether PL suffered from a radiculopathy.

(xii) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named MA, supposedly to determine whether MA suffered from a radiculopathy.

(xiii) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named AC, supposedly to determine whether AC suffered from a radiculopathy.

(xiv) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named SC, supposedly to determine whether SC suffered from a radiculopathy.

(xv) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide NCV tests on at least 13 motor and/or sensory nerves of an Insured named SG, supposedly to determine whether SG suffered from a radiculopathy.

(xvi) On November 25, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named JG, and on December 23, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of JG, supposedly to determine whether JG suffered from a radiculopathy.

(xvii) On January 15, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named BC, and on January 29, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of BC, supposedly to determine whether BC suffered from a radiculopathy.

(xviii) On February 9, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named JM, and on February 23, 2015, NJ Pain and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of JM, supposedly to determine whether JM suffered from a radiculopathy.

(xix) On February 19, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named MB, and on February 26, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of MB, supposedly to determine whether MB suffered from a radiculopathy.

(xx) On April 14, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide NCV tests on at least 9 motor and/or sensory nerves of an Insured named GB, and on May 26, 2015 NJ Pain, Ciccone, Smith, and Micabalo purported to provide a second set of NCV tests on at least 9 motor and/or sensory nerves of GB, supposedly to determine whether GB suffered from a radiculopathy.

258. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

259. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

260. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

261. This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

262. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

263. Even so, NJ Pain, Ciccone, Smith, and Micabalo did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

264. Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibit "1".

265. In particular, NJ Pain, Ciccone, Smith, and Micabalo purported to test some combination of the following peripheral nerves and nerve fibers – and in many cases, all of them – in virtually all of the NCV test claims identified in Exhibit "1":

(i) left and right median motor nerves;

(ii) left and right ulnar motor nerves;

(iii) left and right peroneal motor nerves;

(iv) left and right tibial motor nerves;

(v) left and right superficial peroneal sensory nerves;

(vi) left and right sural sensory nerves;

(vii) left and right median sensory nerves;

(viii) left and right radial sensory nerves; and

(ix) left and right ulnar sensory nerves.

266. The cookie-cutter approach to the NCV tests that NJ Pain, Ciccone, Smith, and Micabalo purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that NJ Pain, Ciccone, Smith, and Micabalo could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

267. Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit maximum charges of: (i) $176.35 for each motor nerve in any limb on which an NCV was performed; and (ii) $135.64 for each sensory nerve in any limb on which an NCV was performed.

268. NJ Pain, Ciccone, Smith, and Micabalo virtually always purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers, not because the NCVs were medically necessary.

**3. The Fraudulent EMGs**

269. EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such

muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

270. There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

271. NJ Pain, Ciccone, Smith, and Micabalo did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

272. Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that NJ Pain, Ciccone, Smith, and Micabalo purported to provide and/or perform often grossly exceeded the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

273. According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

274. Even so, in the substantial majority of the claims for EMG tests identified in Exhibit "1", NJ Pain, Ciccone, Smith, and Micabalo purported to provide and/or perform EMGs on four limbs, in some cases over two separate dates of service, in contravention of the

Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

275. For example:

(i) On May 9, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an Insured named AS, and on May 16, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to AS, supposedly to determine whether AS suffered from a radiculopathy.

(ii) On September 14, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an insured named OM, and on September 18, 2013, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to OM, supposedly to determine whether OM suffered from a radiculopathy.

(iii) On January 8, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named SC, supposedly to determine whether SC suffered from a radiculopathy.

(iv) On April 2, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named CM, supposedly to determine whether CM suffered from a radiculopathy.

(v) On April 4, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a four-limb EMG to an insured named FM, supposedly to determine whether FM suffered from a radiculopathy.

(vi) On April 30, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named CM, supposedly to determine whether CM suffered from a radiculopathy.

(vii) On May 16, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a four-limb EMG to an insured named CH, supposedly to determine whether CH suffered from a radiculopathy.

(viii) On June 11, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named AI, supposedly to determine whether AI suffered from a radiculopathy.

(ix) On September 3, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an Insured named GB, supposedly to determine whether GB suffered from a radiculopathy.

(x) On September 11, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to

provide a two-limb EMG to an insured named JV, and on September 25, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to JV, supposedly to determine whether JV suffered from a radiculopathy.

(xi) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an Insured named AM, supposedly to determine whether AM suffered from a radiculopathy.

(xii) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named AC, supposedly to determine whether AC suffered from a radiculopathy.

(xiii) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named SC, supposedly to determine whether SC suffered from a radiculopathy.

(xiv) On October 22, 2014, NJ Pain, Smith, and Ciccone purported to provide a four-limb EMG to an insured named SG, supposedly to determine whether SG suffered from a radiculopathy.

(xv) On November 23, 2014 NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an insured named JG, and on December 23, 2014, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to JG, supposedly to determine whether JG suffered from a radiculopathy.

(xvi) On January 15, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an insured named BC, and on January 29, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to BC, supposedly to determine whether BC suffered from a radiculopathy.

(xvii) On February 9, 2015 NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an insured named JM, and on February 23, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to JM, supposedly to determine whether JM suffered from a radiculopathy.

(xviii) On February 19, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide a two-limb EMG to an insured named MB, and on February 26, 2015, NJ Pain, Ciccone, Smith, and Micabalo purported to provide another two-limb EMG to MB, supposedly to determine whether MB suffered from a radiculopathy.

276. Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare services providers in the northern New Jersey area to submit maximum charges of: (i) $226.85 if an EMG was performed on at least five muscles of

one limb; (ii) $327.48 if an EMG was performed on at least five muscles in each of two limbs; (iii) $395.17 if an EMG was performed on at least five muscles in each of three limbs; and (iv) $434.98 if an EMG was performed on at least five muscles in each of four limbs.

277. In the vast majority of the EMG claims identified in Exhibit "1", NJ Pain, Ciccone, Smith, and Micabalo purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**4. The Concealment of Excessive and Unnecessary EDX Testing**

278. Not only did NJ Pain, Ciccone, Smith, and Micabalo routinely bill for an excessive and medically unnecessary number of EDX tests, but NJ Pain, Ciccone, Smith, and Micabalo frequently acted to conceal the excessive number of EDX tests that they purported to provide.

279. EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

280. Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed on a single date.

281. This concept is set forth in the Recommended Policy, which states that "It is appropriate for only 1 attending physician to perform or supervise all of the components of the EDX testing (e.g., history taking, physical evaluation, supervision and/or performance of the EDX test, and interpretation) for a given patient and for all the testing to occur on the same date of service."

282. Even so, in order to conceal the fact that they routinely billed for a grossly-excessive number of EMG and NCV tests for virtually every Insured, NJ Pain, Ciccone,

Micabalo, and Smith routinely required the Insureds in the claims identified in Exhibit "1" to return to NJ Pain for EDX tests on two separate dates of service, and then split their charges for the EDX tests onto two separate bills.

283. For example:

(i) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named OM over the course of two separate dates of service – September 14, 2013 and September 18, 2013 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named ER over the course of two separate dates of service –September 16, 2013 and September 30, 2013 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named SD over the course of two separate dates of service – September 27, 2013 and October 4, 2013 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named AS over the course of two separate dates of service – May 9, 2013 and May 16, 2013 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(v) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named LP over the course of two separate dates of service – August 26, 2014 and September 8, 2014 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vi) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named PL over the course of two separate dates of

service – September 18, 2014 and October 9, 2014 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named JG over the course of two separate dates of service – November 25, 2014 and December 23, 2014 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named BC over the course of two separate dates of service – January 15, 2015 and January 29, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 12 motor and/or sensory nerves to an Insured named JO over the course of two separate dates of service – February 6, 2015 and February 13, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(x) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named JM over the course of two separate dates of service – February 9, 2015 and February 23, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xi) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named MB over the course of two separate dates of service – February 19, 2015 and February 26, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named GB over the course of two separate dates of service – April 14, 2015 and May 26, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiii) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named LM over the course of two separate dates of service – April 30, 2015 and May 7, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiv) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named VP over the course of two separate dates of service – May 15, 2015 and May 22, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xv) NJ Pain, Ciccone, Smith, and Micabalo purported to provide an excessive and medically unnecessary four limb EMG and NCV tests on at least 18 motor and/or sensory nerves to an Insured named LT over the course of two separate dates of service – May 28, 2015 and June 4, 2015 – and then split the charges for the EMG and NCV tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

284. These are only representative examples. In the claims for EDX tests identified in Exhibit "1", NJ Pain, Ciccone, Smith, and Micabalo routinely and unnecessarily purported to subject the Insureds to EDX tests on separate dates of service, and split the EDX test charges onto separate bills, to conceal the fact that they were purporting to provide an excessive and unnecessary number of EDX tests to the Insureds.

**5. The Fraudulent Radiculopathy "Diagnoses"**

285. Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

286. Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary electrodiagnostic testing laboratory at

a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom NJ Pain, Ciccone, Smith, and Micabalo purportedly treated.

287. As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

288. As set forth above, virtually none of the Insureds whom NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

289. Even so in order to provide a false justification for the Fraudulent Services that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez already had provided to the Insureds, and a false basis for the continued performance of the medically unnecessary Fraudulent Services, NJ Pain, Ciccone, Smith, and Micabalo falsely purported to identify radiculopathies in the majority of the Insureds in the claims identified in Exhibit "1" to whom they purported to provide EMG and NCV testing.

290. NJ Pain, Ciccone, Smith, and Micabalo purported to arrive at their phony, pre-determined radiculopathy diagnoses in order to create the false appearance of severe injuries, and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide, so as to maximize the fraudulent charges that they could submit to GEICO and other insurers.

**F. The Fraudulent Trigger Point Injections at NJ Pain**

291. As set forth in Exhibit "1", based upon the phony, boilerplate "diagnoses" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided during their fraudulent initial and follow-up examinations, or the phony radiculopathy "diagnoses" that NJ

Pain, Ciccone, Smith, and Micabalo provided at the end of their ersatz EDX tests, Defendants NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko purported to subject many Insureds to a series of medically unnecessary trigger point injections.

292. Typically, Micabalo, Ciccone, and Logvinenko purported to perform the trigger point injections, which then were billed to GEICO through NJ Pain as multiple charges under CPT codes 20552 and 20553.

293. Like the charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the phony, boilerplate "diagnoses" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez provided during their fraudulent examinations.

294. Moreover, in the claims for trigger point injections identified in Exhibit "1", the charges for the trigger point injections were fraudulent in that they misrepresented NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko's eligibility to collect PIP Benefits in the first instance.

295. In fact, NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither they nor the trigger point injections were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1. Standards for Legitimate Use of Trigger Point Injections**

296. Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than

that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

297. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

298. In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

299. In a legitimate clinical setting, trigger point injections should not be administered until a patient has tried and failed such conservative therapies, because invasive treatments such as trigger point injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

300. Moreover, in a legitimate clinical setting, trigger point injections should not be administered more than once every two months, or more than six times in any given year.

301. This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; (ii) a proper interval between trigger point injections is necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**2. The Medically Unnecessary Trigger Point Injections**

302. Even so, in the claims for trigger point injections identified in Exhibit "1", NJ

Pain, Micabalo, Ciccone, Smith, and Logvinenko routinely purported to provide multiple rounds of trigger point injections to the Insureds within a span of weeks, often before the Insureds had tried and failed more conservative forms of treatment, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

303. For example:

(i) On January 7, 2013, an Insured named KC was involved in an accident. Though KC could not have tried and failed more conservative forms of treatment less than two weeks after her accident, Logvinenko, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to KC on January 16, 2013, less than two weeks after her accident.

(ii) On January 20, 2013, an Insured named SU was involved in an accident. Though SU could not have tried and failed more conservative forms of treatment less than three weeks after his accident, Logvinenko, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to SU on February 6, 2013, less than three weeks after his accident.

(iii) On May 10, 2013, an Insured named MS was involved in an accident. Though MS could not have tried and failed more conservative forms of treatment less than one month after her accident, Logvinenko, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to MS on June 5, 2013, less than one month after her accident.

(iv) On October 29, 2013, an Insured named JD was involved in an accident. Though JD could not have tried and failed more conservative forms of treatment less than one month after his accident, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to JD on November 20, 2013, less than one month after his accident.

(v) On January 16, 2014, an Insured named DR was involved in an accident. Though DR could not have tried and failed more conservative forms of treatment less than one month after his accident, Micabalo, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to DR on February 11, 2014, less than one month after his accident.

(vi) On February 24, 2014, an Insured named DJ was involved in an accident. Though DJ could not have tried and failed more conservative forms of treatment less than one month after her accident, Micabalo, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to DJ on March 20, 2014, less than one month after her accident.

(vii) On April 27, 2014, an Insured named AT was involved in an accident. Though DR could not have tried and failed more conservative forms of treatment less than one month after his accident, Micabalo, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to AT on May 22, 2014, less than one month after his accident.

(viii) On June 9, 2014, an Insured named JR was involved in an accident. Though JR could not have tried and failed more conservative forms of treatment less than one month after his accident, Micabalo, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to JR on July 1, 2014, less than one month after his accident.

(ix) On July 31, 2014, an Insured named SC was involved in an accident. Though SC could not have tried and failed more conservative forms of treatment less than one month after his accident, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to SC on August 29, 2014, less than one month after his accident.

(x) On September 24, 2014, an Insured named HG was involved in an accident. Though HG could not have tried and failed more conservative forms of treatment just two weeks after his accident, Ciccone, Smith, and NJ Pain purported to provide medically unnecessary trigger point injections to HG on October 8, 2014, less than one month after his accident.

304. What is more, and strictly by way of example:

(i) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named WR on December 20, 2012, December 27, 2012, and January 2, 2013.

(ii) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named AK on January 3, 2013, January 10, 2013, and January 18, 2013

(iii) Micabalo, Logvinenko, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named KC on January 16, 2013, January 17, 2013, January 19, 2013, January 23, 2013, January 25, 2013, January 30, 2013, and January 31, 2013.

(iv) Logvinenko, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named SU on February 6, 2013, February 13, 2013, February 16, 2013, February 20, 2013, February 23, 2013, February 27, 2013, and March 2, 2013.

(v) Logvinenko, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named JS on February 16, 2013, February 23, 2013,

February 27, 2013, March 7, 2013, and March 14, 2013.

(vi) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named DF on March 11, 2013, March 15, 2013, and March 18, 2013.

(vii) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named AS on March 21, 2013, March 28, 2013, April 4, 2013, and May 2, 2013.

(viii) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named LC on April 9, 2013, April 15, 2013, April 23, 2013, April 26, 2013, May 3, 2013, and May 7, 2013.

(ix) Micabalo, Logvinenko, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named MS on June 5, 2013, June 7, 2013, June 10, 2013, June 14, 2013, and June 17, 2013.

(x) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named LS on July 22, 2013, July 29, 2013, and August 12, 2013.

(xi) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named SD on July 23, 2013, July 26, 2013, July 29, 2013, August 12, 2013, and September 20, 2013.

(xii) Ciccone, Smith, Micabalo, and NJ Pain purported to provide multiple trigger point injections to an Insured named EP on November 12, 2013, November 19, 2013, and November 20, 2013.

(xiii) Ciccone, Smith, Micabalo, and NJ Pain purported to provide multiple trigger point injections to an Insured named JD on November 20, 2013, November 25, 2013, and December 4, 2013.

(xiv) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named DR on January 24, 2014, January 31, 2014, February 7, 2014, February 12, 2014, and February 14, 2014.

(xv) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named KR on January 24, 2014, February 6, 2014, February 14, 2014, and February 21, 2014.

(xvi) Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named DR on February 11, 2014, February 26, 2014, and March 5, 2014.

(xvii) Ciccone, Smith, Micabalo, and NJ Pain purported to provide multiple trigger point injections to an Insured named CM on March 19, 2014, March 24, 2014, March 26, 2014, and March 31, 2014.

(xviii) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named CM on March 31, 2014, April 2, 2014, and April 4, 2014.

(xix) Micabalo, Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named OB on April 4, 2014, April 9 2014, April 23, 2014, May 7, 2014, May 30, 2014, and June 4, 2014.

(xx) Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named MR on April 9, 2014, April 23, 2014, and May 2, 2014.

(xxi) Ciccone, Smith, Micabalo, and NJ Pain purported to provide multiple trigger point injections to an Insured named JR on July 1, 2014, July 9, 2014, July 11, 2014, and August 13, 2014.

(xxii) Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named AB on July 30, 2014, August 1, 2014, and August 6, 2014.

(xxiii) Ciccone, Smith, Micabalo, and NJ Pain purported to provide multiple trigger point injections to an Insured named SG on August 6, 2014, August 15, 2014, October 1, 2014, and October 8, 2014.

(xxiv) Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named SC on August 29, 2014, September 3, 2014, September 10, 2014, and September 17, 2014.

(xxv) Ciccone, Smith, and NJ Pain purported to provide multiple trigger point injections to an Insured named HG on October 8, 2014, October 15, 2014, and October 22, 2014.

305. NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko purported to provide medically-unnecessary trigger point injections to the Insureds in the claims identified in Exhibit "1" despite the fact that such injections – to the extent that they actually occurred – placed the Insureds at risk.

306. Even when performed correctly, the injections that NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko purported to provide can cause significant adverse events including

infection, nerve injury, hypotension, anesthetic toxicity, or even death.

307. To the extent that NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko actually provided injections to Insureds with the frequency set forth in their billing, NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko increased these risks exponentially.

308. NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko's pre-determined treatment protocol, including subjecting patients to multiple rounds of trigger point injections over the course of a few weeks, often before the Insureds had tried and failed any course of more conservative treatment, was designed and employed by NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

### 3. Misrepresentations Regarding the Reimbursable Amount for the Trigger Point Injections

309. As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

310. Not only did NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko routinely provide medically unnecessary trigger point injections, but they also routinely misrepresented the reimbursable amount for the trigger point injections.

311. Specifically, as set forth in Exhibit "1", NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko typically billed for their putative trigger point injections using CPT codes 20552 and 20553.

312. The maximum reimbursable amount for CPT code 20552 was: (i) $123.20, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $129.69, pursuant to the Fee Schedule that was in effect after January 4, 2013.

313. The maximum reimbursable amount for CPT code 20553 was: (i) $243.11, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $256.49, pursuant to the Fee Schedule that was in effect after January 4, 2013.

314. Even so, and as set forth above in Exhibit "1", in their claims for trigger point injections, NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko routinely falsely represented that they were entitled to be paid: (a) $275.00 for trigger point injections under CPT code 20552; and (b) $308.00 for trigger point injections under CPT code 20553.

315. For example:

(i) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named JW on December 21, 2012.

(ii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named KC on January 16, 2013.

(iii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named SU on February 20, 2013.

(iv) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named JS on March 14, 2013.

(v) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named LC on April 26, 2013.

(vi) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named AS on May 2, 2013.

(vii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named MS on June 5, 2013.

(viii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named CP on February 6, 2014.

(ix) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named DR on February 7, 2014.

(x) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named FU on February 12, 2014.

(xi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named DR on February 26, 2014.

(xii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named CM on March 19, 2014.

(xiii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named DJ on March 27, 2014.

(xiv) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named CM on April 2, 2014.

(xv) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named MR on April 9, 2014.

(xvi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named AB on August 6, 2014.

(xvii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named HG on October 8, 2014.

(xviii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $308.00 under CPT code 20553 for trigger point injections they purported to provide to an Insured named MC on October 15, 2014.

(xix) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named EP on November 20, 2014.

(xx) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $275.00 under CPT code 20552 for trigger point injections they purported to provide to an Insured named JC on December 4, 2014.

316. These are only representative examples. As set forth in Exhibit "1", NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko almost always falsely represented that they were entitled to be reimbursed for their putative trigger point injections in amounts far in excess of the amounts set forth in the Fee Schedule.

317. Each and every time that NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko falsely represented that they were entitled to be reimbursed for their putative trigger point injections in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

318. In the claims identified in Exhibit "1", NJ Pain, Micabalo, Ciccone, Smith, and Logvinenko routinely falsely represented that they were entitled to be reimbursed for their putative trigger point injections in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

## G. The Fraudulent Percutaneous Neuromodulation Therapy Treatments at NJ Pain

319. Pursuant to the boilerplate "diagnoses" that they provided to virtually every Insured at the conclusion of their ersatz examinations and EDX tests, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo purported to provide many Insureds with a large number of medically unnecessary percutaneous neuromodulation therapy ("PNT") treatments.

320. NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo billed the PNT treatments through NJ Pain to GEICO under CPT code 64565, typically resulting in charges of $495.00 for each date of service on which they purported to provide the PNT treatments.

321. NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely billed for multiple PNT treatments per Insured, frequently resulting in charges of more than $1,000.00 per Insured who purportedly received the treatment.

322. Like all of the other Fraudulent Services that NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo purported to provide, the charges for the PNT treatments also were fraudulent in that they were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's predetermined fraudulent treatment and billing protocol.

323. In fact, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo never were eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither they nor the PNT treatments were in compliance with all of the relevant laws and regulations governing healthcare practice in New Jersey.

**1. Legitimate Use of PNT Treatments**

324. PNT is a variant of percutaneous electric nerve stimulation ("PENS").

325. In a legitimate clinical setting, PNT is a diagnostic procedure that combines the features of electro-acupuncture and transcutaneous electrical nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PNT is administered through fine needle-like electrodes that are placed in close proximity to the painful area and stimulate peripheral sensory nerves in the soft tissue.

326. According to guidelines published by the Centers for Medicare & Medicaid Services ("CMS"), if pain is effectively controlled through PNT, then implantation of electrodes is warranted.

327. CMS further instructs that physicians generally should be able to determine whether a patient is likely to derive a significant therapeutic benefit from continuing use of implanted electrodes within a one month trial period.

328. CMS further instructs that a patient can be taught how to utilize implanted electrodes and, once this is accomplished, can use them safely and effectively without physician supervision.

329. Consequently, it is inappropriate for a patient to visit his/her physician or an outpatient clinic on a continuing basis for treatment of pain with PNT treatments.

330. In contravention of the CMS guidelines, and keeping with the fact that the PNT treatments purportedly provided to Insureds were medically unnecessary, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely subjected individual Insureds to PNT treatments for more than two months.

331. Furthermore, in the PNT claims identified in Exhibit "1", the Insureds never received an implanted electrode.

332. Rather, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely billed GEICO for thousands of dollars representing multiple PNT treatments they purportedly provided to a single Insured over a period of time exceeding two months, without ever providing any of those Insureds with implanted electrodes.

333. For instance:

(i) Logvinenko, Ciccone, Smith, and NJ Pain billed GEICO for $5,445.00 representing 11 separate PNT treatments they purportedly provided to an Insured

named JS between January 23, 2013 and April 6, 2013. The Insured never received any implanted electrodes.

(ii) Logvinenko, Ciccone, Smith, and NJ Pain billed GEICO for $5,445.00 representing 11 separate PNT treatments they purportedly provided to an Insured named KC between February 7, 2013 and May 29, 2013. The Insured never received any implanted electrodes.

(iii) Micabalo, Ciccone, Smith, and NJ Pain billed GEICO for $4,455.00 representing 9 separate PNT treatments they purportedly provided to an Insured named LC between May 20, 2013 and August 12, 2013. The Insured never received any implanted electrodes.

(iv) Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for $7,920.00 representing 16 separate PNT treatments they purportedly provided to an Insured named ER between July 12, 2013 and November 13, 2013. The Insured never received any implanted electrodes.

(v) Micabalo, Ciccone, Smith, and NJ Pain billed GEICO for $6,435.00 representing 13 separate PNT treatments they purportedly provided to an Insured named SD between August 26, 2013 and December 20, 2013. The Insured never received any implanted electrodes.

(vi) Micabalo, Ciccone, Smith, and NJ Pain billed GEICO for $7,920.00 representing 16 separate PNT treatments purportedly provided to an Insured named VW between August 26, 2013 and January 8, 2014. The Insured never received any implanted electrodes.

(vii) Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for $5,940.00 representing 12 separate PNT treatments they purportedly provided to an Insured named OM between September 13, 2013 and December 16, 2013. The Insured never received any implanted electrodes.

(viii) Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for $5,940.00 representing 12 separate PNT treatments purportedly provided to an Insured named FU between February 14, 2014 and May 14, 2014. The Insured never received any implanted electrodes.

(ix) Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for $8,910.00 representing 18 separate PNT treatments they purportedly provided to an Insured named CM between April 4, 2014 and August 27, 2014. The Insured never received any implanted electrodes.

(x) Ciccone, Smith, Micabalo, and NJ Pain billed GEICO for $6,930.00 representing 14 separate PNT treatments they purportedly provided to an Insured named CM

between April 9, 2014 and June 11, 2014. The Insured never received any implanted electrodes.

334. Furthermore, to the extent that NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo actually provided any electrical stimulation treatments to Insureds in the first instance, the electrical stimulation treatments constituted physical therapy treatments under the Fee Schedule.

335. Pursuant to the Fee Schedule, electrical stimulation physical therapy treatments are billable at a much lower rate than PNT treatments.

336. NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo deliberately misrepresented the electrical stimulation physical therapy treatments they purported to provide as PNT treatments in a calculated attempt to overcharge GEICO for the electrical stimulation treatments.

337. In fact, the PNT treatments that NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo purported to provide were medically unnecessary, and the treatments were provided – to the extent that they were provided at all – solely to financially enrich NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez, not to benefit the Insureds who were subjected to them.

**2. Misrepresentations Regarding the Reimbursable Amount for the PNT Treatments**

338. As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

339. Not only did NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely administer medically unnecessary PNT treatments, but they also routinely misrepresented the reimbursable amount for the PNT treatments.

340. To maximize the amount of fraudulent billing that they could submit to GEICO

and other automobile insurers for their fraudulent PNT treatments, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely misrepresented the reimbursable amount for the PNT treatments.

341. Specifically, as set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo typically billed for their putative PNT treatments using CPT code 64565

342. The maximum reimbursable amount for CPT code 64565 was: (i) $295.71, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $286.59, pursuant to the Fee Schedule that was in effect after January 4, 2013.

343. Even so, and as set forth above in Exhibit "1", in their claims for PNT Treatments, NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely falsely represented that they were entitled to be paid $495.00 under CPT code 64565.

344. For example:

(i) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named JS on January 23, 2013;

(ii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named KC on February 7, 2013;

(iii) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named WC on February 13, 2013;

(iv) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named AK on February 18, 2013;

(v) Logvinenko, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named SU on April 13, 2013;

(vi) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named ER on August 13, 2013;

(vii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named VW on August 26, 2013;

(viii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named OM on October 11, 2013;

(ix) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named SD on November 27, 2013;

(x) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named JD on January 29, 2014;

(xi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named EP on February 5, 2014;

(xii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named FU on February 12, 2014;

(xiii) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named LB on February 24, 2014;

(xiv) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named DR on March 7, 2014;

(xv) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named VC on March 7, 2014;

(xvi) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named DR on April 2, 2014;

(xvii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named CM on April 9, 2014;

(xviii) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named CM on April 23, 2014;

(xix) Micabalo, Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named AT on May 1, 2014; and

(xx) Ciccone, Smith, and NJ Pain falsely represented that they were entitled to be reimbursed $495.00 under CPT code 64565 for a PNT treatment they purported to provide to an Insured named JR on July 11, 2014.

345. These are only representative examples. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo almost always falsely represented that they were entitled to be reimbursed for their putative PNT treatments in amounts far in excess of the amounts set forth in the Fee Schedule.

346. Each and every time that NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo falsely represented that they were entitled to be reimbursed for their putative PNT treatments in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

347. In the claims identified in Exhibit "1", NJ Pain, Ciccone, Smith, Logvinenko, and Micabalo routinely falsely represented that they were entitled to be reimbursed for their PNT treatments in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

### H. The Fraudulent Billing for Chiropractic Services at NJ Pain

348. NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's fraudulent scheme also included the submission through NJ Pain of a massive amount of fraudulent billing for medically unnecessary chiropractic and physical therapy services.

349. Mendez purported to perform virtually all of the chiropractic and physical therapy services that were billed to GEICO through NJ Pain.

350. As set forth in Exhibit "1", NJ Pain, Ciccone, Smith, and Mendez typically billed the chiropractic and physical therapy services to GEICO under CPT codes 97012, 97112, 97140, 98940, 98941, 98942, 98943, and under Health Care Common Procedure Coding System ("HCCPCS") code G0283.

351. In the claims for chiropractic and physical therapy services identified in Exhibit "1", the charges for chiropractic and physical therapy services were fraudulent in that the chiropractic services were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the phony results of the ersatz initial and follow-up examinations.

352. As set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any healthcare problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

353. The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

354. The Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months, without observable improvement. See 30 N.J.R. 4401(a).

355. NJ Pain, Ciccone, Smith, and Mendez knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic and physical therapy services to the Insureds in the claims identified in Exhibit "1" – their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

356. Accordingly, NJ Pain, Ciccone, Smith, and Mendez used the phony, fabricated "diagnoses" provided during their fraudulent initial and follow-up initial examinations as a false basis to bill for months and months of medically unnecessary chiropractic and physical therapy treatment in gross deviation from the Care Paths.

357. Towards that end, at the conclusion of virtually every purported follow-up examination in the claims identified in Exhibit "1", the examining chiropractor or physician would refer the Insureds back to NJ Pain for additional, medically unnecessary chiropractic and physical therapy "treatments".

358. In keeping with the fact that these referrals for continued chiropractic "treatments" were not predicated on medical necessity, NJ Pain's own records frequently indicated that the previous, extensive chiropractic and physical therapy "treatments" that the Insureds had received had not been effective in resolving their purported complaints.

359. For example:

(i) On November 10, 2012, an Insured named JW was involved in an automobile accident. The contemporaneous police reports indicate that no one was injured and JW refused medical treatment at the scene of the accident. Even so, later that day, JW presented to Meadowlands Hospital where he complained of a headache but denied experiencing any neck or back pain. JW was examined and discharged on the same day with a head bruise diagnosis. To the extent that JW experienced any health problems at all as the result of his accident, they were minor injuries that did not require four months of chiropractic and physical therapy treatment.

Even so, following purported follow-up examinations of JW by Micabalo, Mendez, and NJ Pain on January 2, 2013, January 30, 2013, February 4, 2013, March 1, 2013, and March 4, 2013, Micabalo, Mendez, and NJ Pain routinely directed JW continue to receive chiropractic and physical therapy treatment at NJ Pain, despite the fact that the large amount of chiropractic and physical therapy services JW previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Mendez and Micabalo, JW received four months of purported chiropractic and physical therapy "treatments" at NJ Pain.

(ii) On November 21, 2012, an Insured named VU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured as a result of the accident, the cars were drivable as a result of the accident, the airbags in VU's automobile did not deploy, and VU refused medical attention at the scene of the accident. Even so, later that day, VU presented to Palisades Medical Center where she was examined and discharged on the same day. To the extent that VU experienced any health problems at all as the result of her minor automobile accident, they were minor soft tissue injuries that did not require five months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of VU by Micabalo, Mendez, and NJ Pain on January 7, 2013, January 16, 2013, February 25, 2013, February 27, 2013, and June 26, 2013, Micabalo, Mendez, and NJ Pain routinely directed VU continue to receive chiropractic and physical therapy treatment at NJ Pain, despite the fact that the large amount of chiropractic and physical therapy services VU previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Micabalo and Mendez VU received five months of purported chiropractic and physical therapy "treatments" at NJ Pain.

(iii) On October 13, 2012, an Insured named JS was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicates that no one was injured in the accident and the car JS was traveling in was drivable following the accident. Furthermore, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of her minor accident, they were minor soft tissue injuries that did not require six months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of JS by Logvinenko, Mendez, Micabalo, and NJ Pain on January 29, 2013, February 13, 2013, February 18, 2013, March 14, 2013, April 17, 2013, May 15, 2013, May 22, 2013, and June 26, 2013, Mendez, Logvinenko, Micabalo, and NJ Pain routinely directed JS continue to receive chiropractic and physical therapy treatment at NJ Pain, despite the fact that the large amount of chiropractic and physical therapy services JS previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Mendez, Logvinenko,

and Micabalo, JS received six months of purported chiropractic and physical therapy "treatments" at NJ Pain.

(iv) On July 16, 2013, an Insured named OM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags did not deploy, OM's car was drivable following the accident, OM drove his car from the accident site, and OM refused medical treatment at the scene of the accident. Even so, OM presented later that day at Palisades Medical Center where he was briefly observed, and then discharged with a minor sprain/strain diagnosis. The hospital medical records indicate that OM's symptoms were mild and improving at the time he was discharged. To the extent OM experienced any health problems at all as the result of his minor accident, they were minor soft tissue injuries that did not require five months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of OM by Micabalo, Mendez, Ciccone, and NJ Pain on August 30, 2013, September 27, 2013, October 2, 2013, October 30, 2013, November 1, 2013, November 13, 2013, November 20, 2013, and December 2, 2013, Micabalo, Mendez, Ciccone, and NJ Pain routinely directed that OM continue to receive chiropractic and physical therapy treatment at NJ Pain, despite the fact that the large amount of chiropractic and physical therapy services OM previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Micabalo, Mendez, and Ciccone, OM received five months of purported chiropractic and physical therapy "treatments" at NJ Pain.

(v) On December 17, 2013, an Insured named FU was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured during the accident, the airbags did not deploy, the cars were drivable following the accident, and FU refused medical attention at the scene of the accident. Even so, the following day, FU presented to Jersey City Medical Center, where she was briefly observed and discharged. To the extent that FU experienced any health problems at all as the result of her minor accident, they were minor soft tissue injuries that did not require four months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of FU by Ciccone, Mendez, and NJ Pain on January 22, 2014, February 12, 2014, February 14, 2014, February 19, 2014, February 26, 2014, March 5, 2014, March 26, 2014, April 2, 2014, April 16, 2014, April 21, 2014, May 7, 2014, and May 14, 2014, Mendez, Ciccone, and NJ Pain routinely directed that FU continue to receive chiropractic and physical therapy treatment at NJ Pain, despite the fact that the large amount of chiropractic and physical therapy services FU previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Ciccone and Mendez, FU received four months of purported chiropractic and physical therapy "treatments" at NJ Pain.

360. These are only representative examples. In virtually all of the claims for chiropractic services that are identified in Exhibit "1", Mendez, Ciccone, Smith, and NJ Pain used the phony "diagnoses" that NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez purported to provide at the conclusion of their ersatz examinations and electrodiagnostic tests as a false basis to bill for months of medically unnecessary chiropractic treatment in gross deviation from the Care Paths.

361. As set forth above, the Care Paths – which generally require healthcare providers to provide some objective justification for the medical necessity of the continued healthcare service at the four-week, eight-week, and 13-week mark – are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See N.J.R. 4401(a).

362. NJ Pain, Ciccone, Smith, Micabalo, Logvinenko, Baynes, and Mendez's fraudulent scheme enabled them to bill GEICO for thousands of dollars in charges for months of medically unnecessary chiropractic services per Insured, without regard for the Insureds' true circumstances or presentment.

## III. The Fraudulent Billing Submitted to GEICO

363. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports to GEICO, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

364. The HCFA-1500 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i) The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that Defendants were in

compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they routinely billed GEICO for medically unnecessary services; and (b) they routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and, in many cases, illusory; and (b) the Fraudulent Services routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c).

(iii) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV. <u>The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

365. The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

366. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

367. For example, and as set forth above, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

368. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against all Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A. 17:33A-1 et seq.)**

369. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 368 above.

370. In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", the Defendants knowingly submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports through NJ Pain to GEICO that were false and misleading in the following material respects:

(i) The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement because: (a) they routinely billed GEICO for medically unnecessary services; and (b) they routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services.

(ii) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) the Fraudulent Services were medically unnecessary and, in many cases, illusory; and (b) the Fraudulent Services routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c).

(iii) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, to the extent that the Fraudulent Services were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

371. The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constituted a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP Benefits paid in an amount to be established at trial, but exceeding $240,000.00, but it is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## SECOND CAUSE OF ACTION
**Against Smith and Ciccone**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

372. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 368 above.

373. NJ Pain is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

374. Smith and Ciccone knowingly have conducted and/or participated, directly or indirectly, in the conduct of NJ Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that NJ Pain was not eligible to receive under the New Jersey no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to financially enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) neither NJ Pain nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

375. NJ Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Smith and Ciccone operate NJ Pain, insofar as NJ Pain is not engaged in a legitimate healthcare practice, and acts of mail fraud therefore are essential in order for NJ Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

376. NJ Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NJ Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

377. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

378. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
**Against Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

379. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 368 above.

380. NJ Pain is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

381. Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes are employed by or associated with the NJ Pain enterprise.

382. Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of NJ Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that NJ Pain were not eligible to receive under the New Jersey no-

fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) neither NJ Pain nor the underlying services were in compliance with New Jersey law. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

383. Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

384. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted through NJ Pain.

385. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes**
**(Common Law Fraud)**

386. GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 368 above.

387. NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through NJ Pain seeking payment for the Fraudulent Services.

388. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in every claim, the representation that NJ Pain and the Fraudulent Services were in compliance with New Jersey law and eligible to receive no-fault reimbursement, when in fact they were not; (iii) in every claim, concealment of the fact that the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes; and (iv) in every claim, concealment of the fact that neither NJ Pain nor the Fraudulent Services were eligible to receive no-fault reimbursement.

389. NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NJ Pain that were not compensable under New Jersey's No-Fault Laws.

390. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted by NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes through NJ Pain.

391. NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

392. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against all Defendants**
**(Unjust Enrichment)**

393. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 368 above.

394. As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

395. When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through NJ Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

396. The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

397. The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

398. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $240,000.00 dollars.

## JURY DEMAND

399. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A. On the First Cause of Action against all Defendants, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $240,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

B. On the Second Cause of Action against Smith and Ciccone, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against NJ Pain, Ciccone, Smith, Micabalo, Mendez, Logvinenko, and Baynes, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $240,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against all Defendants, more than $240,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Hackensack, New Jersey
June 13, 2018

RIVKIN RADLER LLP

By: ______________________________

John Robertelli, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Sean Gorton, Esq.
21 Main Street, Suite 158
Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287-2460